[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 547.]

ANDERSEN, ADMR., *v.* HIGHLAND HOUSE COMPANY ET AL., APPELLANTS;

INDIANA INSURANCE COMPANY, APPELLEE.

[Cite as *Andersen v. Highland House Co.*, 2001-Ohio-1607.]

*Insurance—Carbon monoxide emitted from a residential heater is not a "pollutant" under the pollution exclusion of a commercial general liability insurance policy unless specifically enumerated as such.*

(No. 00-1214—Submitted May 15, 2001—Decided November 14, 2001.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 75769.

_____

SYLLABUS OF THE COURT

Carbon monoxide emitted from a residential heater is not a "pollutant" under the pollution exclusion of a commercial general liability insurance policy unless specifically enumerated as such.

_____

ALICE ROBIE RESNICK, J.

{¶ 1} On March 7, 1997, Lisa Andersen died and Daniel Wojtala was injured after inhaling carbon monoxide fumes from a faulty heating unit inside the Highland House Apartments, a multiunit complex owned by appellant Highland House Company ("Highland House") and managed by appellant Renaissance Management, Inc. ("RMI"). At the time of the accident, Highland House and RMI were covered by commercial insurance policies issued by appellee Indiana Insurance Company ("Indiana Insurance"). All of the policies contained pollution exclusions.

{¶ 2} As a result of Andersen's death, three lawsuits were filed. In the first action, Andersen's estate sued Highland House and RMI for wrongful death. In the second action, Highland House and RMI sought a declaratory judgment that

Indiana Insurance had a duty to defend and indemnify them in the wrongful death action. In the third action, Indiana Insurance sought a declaratory judgment that it did not have a duty to defend and indemnify Highland House and RMI. All three cases were consolidated and the underlying tort claims were settled. Thereafter, the trial court focused on the scope of policy coverage relative to the pollution exclusions.

{¶ 3} Highland House and RMI moved for summary judgment, arguing that the pollution exclusion language was ambiguous and should only be construed as pertaining to environmental pollution. Conversely, Indiana Insurance contended that the policy language was unambiguous and clearly excluded claims for death and injuries related to residential carbon monoxide poisoning. The trial court ruled in favor of Highland House and RMI, and Indiana Insurance appealed. The Eighth District Court of Appeals reversed, finding that the policies precluded coverage. The cause is now before this court upon the allowance of a discretionary appeal.

{¶ 4} The issue before us is whether the pollution exclusion language in the present case precludes coverage for death and injuries stemming from residential carbon monoxide poisoning. We hold today that Indiana Insurance does have a duty to defend and indemnify the insureds because the policy language in question does not clearly, specifically, and unambiguously state that coverage for residential carbon monoxide poisoning is excluded. We, therefore, reverse the judgment of the court of appeals.

{¶ 5} A grant of summary judgment is reviewed under a *de novo* standard. *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243, 1245. In order to resolve the coverage question, we must first review the pollution exclusion policy language. In pertinent part, the exclusion states:

**"2. Exclusions.**

"This insurance does not apply to:

"* * *

**"f. Pollution**

"(1) 'Bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

"(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

"* * *

"Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

{¶ 6} In *Dealers Dairy Products Co. v. Royal Ins. Co.* (1960), 170 Ohio St. 336, 10 O.O.2d 424, 164 N.E.2d 745, paragraph one of the syllabus, the court established that "[a] policy of insurance is a contract and like any other contract is to be given a reasonable construction in conformity with the *intention of the parties* as gathered from the ordinary and commonly understood meaning of the language employed." (Emphasis added.)

{¶ 7} Indiana Insurance argues that carbon monoxide qualifies as a "pollutant" in the instant case because it is a "gaseous * * * irritant or contaminant" and that by definition, it is "a colorless odorless very toxic gas * * * formed as a product of the incomplete combustion of carbon * * *." Webster's Third New International Dictionary (1986) 336. Indiana Insurance further contends that Highland House and RMI should have known that deaths and injuries caused by carbon monoxide poisoning would not be covered based on the general definition of "pollutants" provided in the policy. However, in *Home Indemn. Co. of New York v. Plymouth* (1945), 146 Ohio St. 96, 32 O.O. 30, 64 N.E.2d 248, paragraph two of the syllabus, this court stated that "[w]here exceptions * * * are introduced into an insurance contract, a general presumption arises to the effect that that which is not *clearly excluded* from the operation of such contract is included in the operation

thereof." (Emphasis added.) Thus, *Plymouth* reasons that if a policy does not plainly exclude a claim from coverage, then an insured may infer that the claim will be covered.

{¶ 8} In the case at bar, the policy in question never clearly excludes claims for deaths or injuries caused by residential carbon monoxide poisoning. It is not the responsibility of the insured to guess whether certain occurrences will or will not be covered based on nonspecific and generic words or phrases that could be construed in a variety of ways. Thus, in order to defeat coverage, "the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question." Reiter, Strasser & Pohlman, The Pollution Exclusion Under Ohio Law: Staying The Course (1991), 59 U.Cin.L.Rev. 1165, 1179. See *Lane v. Grange Mut. Cos.* (1989), 45 Ohio St.3d 63, 65, 543 N.E.2d 488, 490 ("Where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured").

{¶ 9} Furthermore, the genesis of the pollution exclusion does not support the notion that it was created to preclude the kind of claim involved in this case. In June 1970, the insurance industry "went on record as being 'against' intentional polluters and promulgated the qualified pollution exclusion for insertion in all comprehensive general liability (CGL) insurance policies." (Footnotes omitted.) Reiter, Strasser & Pohlman, *supra*, 59 U.Cin.L.Rev. at 1168. The insurance industry explained that "[a]ccidental pollution continued to be insured under a CGL policy, but deliberate polluters would remain uncovered, unable to use insurance to avoid the financial consequences of their acts. On the basis of these representations, nearly every state, including Ohio, allowed the introduction of this new, qualified pollution exclusion." (Footnotes omitted.) *Id*.

**{¶ 10}** The exclusion disputed in the case at bar, the absolute pollution exclusion, "was drafted during the early 1980s and was incorporated into the standard form CGL [policies] in 1986." Stempel, Reason and Pollution: Correctly Construing the "Absolute" Exclusion in Context and in Accord With Its Purpose and Party Expectations (1998), 34 Tort & Ins.L.J. 1, 5. The purpose of the new exclusion was "to replace the 1973 'sudden and accidental' exclusion because insurers were distressed by judicial decisions holding that the 1973 exclusion did not preclude coverage for gradual but unintentional pollution." *Id.* Further, "[t]he absolute exclusion was designed to bar coverage for gradual environmental degradation of any type and to preclude coverage responsibility for government-mandated cleanup[s]." *Id.*

**{¶ 11}** Based on the history and original purposes for the pollution exclusion, it was reasonable for Highland House and RMI to believe that the policies purchased for their multiunit complex would not exclude claims for injuries due to carbon monoxide leaks. Thus, since insurance policies are interpreted strictly against the insurer, "[i]t will not suffice for [Indiana Insurance] to demonstrate that its interpretation is more reasonable than the policyholder's." Reiter, Strasser & Pohlman, *supra*, 59 U.Cin.L.Rev. at 1179. See *Am. Fin. Corp. v. Fireman's Fund Ins. Co.* (1968), 15 Ohio St.2d 171, 174, 44 O.O.2d 147, 148, 239 N.E.2d 33, 35 ("[T]he insurer, being the one who selects the language, must be specific in its use, and an exclusion from liability must be clear and exact in order to be given effect").

**{¶ 12}** The legal effect of the reasonable belief on the part of Highland House and RMI is comparable to the effect of the reasonable-expectations doctrine.

**{¶ 13}** The Restatement of the Law 2d, Contracts (1981), Section 211, Comment *f*, discusses the ambit of the reasonable-expectations doctrine:

"Terms excluded. * * * Although customers typically adhere to standardized agreements and are bound by them without even appearing to know

the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation. * * * Similarly, a party who adheres to the other party's standard terms does not assent to a term if the other party has reason to believe that the adhering party would not have accepted the agreement if he had known that the agreement contained the particular term. * * * Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that it eviscerates the non-standard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction."

{¶ 14} While we make no determination on the merits of the reasonable-expectations doctrine, this rationale could apply to the case at bar. Highland House and RMI are both involved in the rental property business. A major concern of these two entities, and many owners and managers of commercial and residential property, is deaths or injuries caused by carbon monoxide poisoning. To protect themselves from any potential claims based on that hazard, the two companies were covered by insurance policies. None of the policies identified carbon monoxide poisoning as a hazard excluded from coverage. Based on the information given in the policies, Highland and RMI reasonably believed that Indiana Insurance would defend and indemnify them against claims related to potential premises hazards and did not anticipate that such claims would be denied based on the pollution exclusion.

{¶ 15} Other jurisdictions also recognize the importance of interpreting ambiguities in insurance contracts in favor of the insured. In *Davis v. M.L.G. Corp.* (Colo.1986), 712 P.2d 985, 989, the court, quoting *Elliott Leases Cars, Inc. v. Quigley* (1977), 118 R.I. 321, 325-326, 373 A.2d 810, 812, stated: " 'If there remains any doubt, the terms should be read in the sense which the insurer had reason to believe they would be interpreted by the ordinary reader and purchaser. The test to be applied is not what the insurer *intended* by his words, but what the ordinary reader and purchaser *would have understood them to mean*.' " (Emphasis

added.)  In *Regional Bank of Colorado, N.A. v. St. Paul Fire & Marine Ins. Co.* (C.A.10, 1994), 35 F.3d 494, 498, the court said that "[w]hile a reasonable person of ordinary intelligence might well understand [that] carbon monoxide is a pollutant when it is emitted in an industrial or environmental setting, an ordinary policyholder would not reasonably characterize carbon monoxide emitted from a residential heater which malfunctioned as 'pollution.' "  Although these cases are not controlling, they do provide persuasive support for the underlying notion that this particular policy language is ambiguous and therefore should be interpreted in favor of the insured.  As the final authority on Ohio law, we must take the opportunity to prevent an absurd and unreasonable result—one that was never clearly intended by Highland House or RMI and one that was never clearly communicated by Indiana Insurance.  The court in *Am. States Ins. Co. v. Koloms* (1997), 177 Ill.2d 473, 492-493, 227 Ill.Dec. 149, 158, 687 N.E.2d 72, 81, best described the real purpose of the pollution exclusion when it wrote: "Our review of the history of the pollution exclusion amply demonstrates that the predominate motivation in drafting an exclusion for pollution-related injuries was the avoidance of the 'enormous expense and exposure resulting from the "explosion" of *environmental* litigation.'  (Emphasis added.)  *Weaver* [*v. Royal Ins. Co. of Am.* (1996)], 140 N.H. [780] at 783, 674 A.2d [975] at 977, quoting *Vantage Development Corp. v. American Environment Technologies Corp.*, 251 N.J.Super. 516, 525, 598 A.2d 948, 953 (1991).  * * *  We would be remiss * * * if we were to simply look to the bare words of the exclusion, ignore its *raison d'etre*, and apply it to situations which do not remotely resemble traditional environmental contamination."  Based on this sound logic, and on other principles stated herein, we hold that carbon monoxide emitted from a malfunctioning residential heater is not a pollutant under the pollution exclusion of a comprehensive general liability policy unless specifically enumerated as such. We, therefore, reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

*Judgment reversed.*

DOUGLAS, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur separately.

MOYER, C.J., and COOK, J., dissent.

_____

**DOUGLAS, J., concurring.**

{¶ 16} I concur in the syllabus, judgment, and opinion of the majority. I write further only to bring attention to evidence in the record that I believe shows that Indiana Insurance intended these policies to provide coverage for accidents involving carbon monoxide exposure. This evidence is in the form of an "Apartment Evaluation Supplement" questionnaire completed by an underwriter for Indiana Insurance in determining whether to issue insurance policies to Highland House and RMI. The questionnaire was to be "used by the underwriter to review * * * all the major underwriting standards important in the determination if a risk qualifies for [insurance]" and was "meant to alert the underwriter to the more common elements of underwriting this class of business." Under the heading "Premises Liability" the questionnaire asks whether carbon monoxide detectors are provided in the apartments. (The word "some" was written next to this inquiry on the questionnaire.) If, as Indiana Insurance asserts, the standard commercial general liability insurance policy denies coverage for carbon monoxide exposure, then why would the standard apartment evaluation supplement question whether carbon monoxide detectors are provided in the apartments and why would the underwriter feel compelled to answer the question? If carbon monoxide exposure were not covered, then why would this information be "important in the determination if a risk qualifies for [insurance]"? I believe that this questionnaire clearly shows that Indiana Insurance intended its commercial general liability policies of insurance to provide coverage for carbon monoxide exposure notwithstanding its pollution exclusion. At a minimum, the underwriter's request

for this information from a potential insured supports the potential insured's reasonable belief that liability for such accidents would be covered by the policy.

F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur in the foregoing concurring opinion.

_____

**COOK, J., dissenting.**

{¶ 17} Today's majority relies upon questionable analytical foundations in a strained attempt to find coverage where none exists. I therefore respectfully dissent for the reasons that follow.

*Interpretation of the Pollution Exclusion*

{¶ 18} Each of the policy exclusions at bar states, with minor variations in wording irrelevant to this court's inquiry, that coverage does not extend to " 'bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." A "pollutant" is defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

{¶ 19} Construing this language, the trial court held that the exclusion applied "only to environmental discharge of traditionally environmental pollutants and not to cases involving exposure to carbon monoxide produced by a defective heating unit inside of a residential apartment unit." The court of appeals rejected this conclusion, holding that "the pollution exclusion in the insurance contract issued to the insureds clearly and unambiguously precluded coverage for the claims asserted by the injured parties."

{¶ 20} I agree with the reasoning and conclusion of the court of appeals. It is well settled that "insurance contracts must be construed in accordance with the same rules as other written contracts." *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096, 1102. Therefore, "if

the language of the policy's provisions is clear and unambiguous, this court may not 'resort to construction of that language.' " *Id.*, quoting *Karabin v. State Auto. Mut. Ins. Co.* (1984), 10 Ohio St.3d 163, 167, 10 OBR 497, 499, 462 N.E.2d 403, 406. Rather, courts must give the words and phrases used in an insurance policy " 'their natural and commonly accepted meaning, where they in fact possess such meaning, to the end that a reasonable interpretation of the insurance contract consistent with the apparent object and plain intent of the parties may be determined.' " *Id.*, quoting *Tomlinson v. Skolnik* (1989), 44 Ohio St.3d 11, 12, 540 N.E.2d 716, 717-718.

{¶ 21} Whether the carbon monoxide incident that occurred in this case fits within the pollution exclusion therefore depends upon the meaning of the exclusion language. The majority finds that the exclusions contain "nonspecific and generic words or phrases that could be construed in a variety of ways." This conclusion, however, both devalues any suggestion that, absent contrary intent, some words carry fixed meanings and favors conjuring ambiguity over objectivity.

{¶ 22} The exclusions' heading is "pollution." Two natural and commonly accepted meanings of pollution are "1: *the action of polluting* [especially] by environmental contamination with man-made waste; also: the condition of being polluted 2: *POLLUTANT*." (First emphasis added.) Merriam-Webster's Collegiate Dictionary (10 Ed.1999) 902. The dictionary definition of a "pollutant" is simply "something that pollutes." *Id*. As noted, the exclusions provide a more detailed definition of "pollutants."

{¶ 23} Carbon monoxide fits into both definitions of a pollutant, as its commonly accepted meaning is "a colorless odorless very toxic *gas* CO that burns to carbon dioxide with a blue flame and is formed as a product of the incomplete combustion of carbon." (Emphasis added.) Merriam-Webster's Collegiate Dictionary, *supra*, at 171. This definition falls within the exclusion's definition of pollution as "any * * * gaseous * * * irritant or contaminant, including * * * vapor,

10

* * * fumes, * * * [and] chemicals." One commonly accepted meaning of "vapor" is "a substance in the *gaseous* state as distinguished from the liquid or solid state." (Emphasis added.) *Id*. at 1306. Similarly, a "fume" is "*a smoke, vapor, or gas* [especially] when irritating or offensive" or "an often noxious suspension of particles in a gas (as air)." (Emphasis added.) *Id*. at 472. These are not technical definitions describing environmental terms of art. The words are neither "nonspecific" nor "generic." Rather, these are common words bearing commonly accepted meanings available to any layperson. Therefore, I conclude both that carbon monoxide falls within the foregoing definition of a "pollutant" and that the policies clearly exclude coverage.

**{¶ 24}** Courts construing Ohio law have reached similar conclusions regarding pollution exclusions. See *Zell v. Aetna Cas. & Sur. Ins. Co.* (1996), 114 Ohio App.3d 677, 683 N.E.2d 1154 (pollution exclusion precluded coverage for fumes from weatherproofing materials); *Air Prods. & Chems. v. Indiana Ins. Co.* (Dec. 23, 1999), Hamilton App. Nos. C-980947 and C-990009, unreported, 2000 WL 955600, at *6 (pollution exclusion precluded coverage for methane gas leak); *Owners Ins. Co. v. Singh* (Sept. 21, 1999), Richland App. No. 98-CA-108, unreported, 1999 WL 976249, at *3 (pollution exclusion was clear and unambiguous so as to preclude coverage for carbon monoxide from a malfunctioning furnace). See, also, *Longaberger Co. v. United States Fid. & Guar. Co.* (S.D.Ohio 1998), 31 F.Supp.2d 595, affirmed (C.A.6, 1999), 201 F.3d 441 (unpublished disposition), opinion at 1999 WL 1252874 (both holding that under Ohio law a similar pollution exclusion was not ambiguous and precluded coverage for carbon monoxide released into a home by a furnace).

**{¶ 25}** Courts in other jurisdictions have reached the same conclusion regarding the scope of such pollution exclusions. See, *e.g.*, *Deni Assoc. of Florida, Inc. v. State Farm Fire & Cas. Ins. Co.* (Fla.1998), 711 So.2d 1135, 1138, quoting *Am. States Ins. Co. v. F.H.S., Inc.* (S.D.Miss.1991), 843 F.Supp. 187, 190 ("The

court reiterates that it is not free to rewrite the terms of the insurance contract where that contract is not ambiguous"); *W. Am. Ins. Co. v. Band & Desenberg* (M.D.Fla.1996), 925 F.Supp. 758, 761 ("The majority of courts that have reviewed these absolute [pollution] exclusions have found them to be unambiguous and have enforced then in accordance with their plain language"). See, also, 9 Russ & Segalla, Couch on Insurance (3 Ed.1997) 127-36 to 127-37, Section 127:14, fn. 30 (collecting cases that have found "absolute" pollution exclusions unambiguous), and 127-39, Section 127:15 (noting that the majority view regards such exclusions as unambiguous). Accordingly, I would hold that the pollution exclusions at issue herein clearly and unambiguously preclude coverage.

*Historical Context of the Exclusion*

{¶ 26} The majority relies upon "the genesis of the pollution exclusion" to conclude that "[b]ased on the history and original purposes for the pollution exclusion, it was reasonable for Highland House and RMI to believe that the policies purchased for their multiunit complex would not exclude claims for injuries due to carbon monoxide leaks." Without citing a basis for doing so, the majority apparently credits Highland House and RMI as having had knowledge of the historical development of absolute pollution exclusions at the time they purchased the relevant policies and accepts this as informing the relevant policy language. But Indiana Insurance argues that Highland House and RMI failed to produce summary judgment evidence in the record supporting this "historical context" argument.

{¶ 27} By focusing on supposed after-the-fact knowledge of the insureds, the majority narrows the meaning of the pollution exclusions beyond that conveyed by the common understanding of the words. The policy language itself, however, offers no reason to eschew the dictionary uses of these common words in favor of discerning the meaning from the historical development of pollution exclusions. The *text* of the policy exclusions guides judicial interpretation. Nothing in the text of the policies limits application of the exclusions to environmental-type pollution.

**{¶ 28}** Instead, as noted, the exclusions contain ordinary words that on their face bear the broad application understood by the court of appeals here. To collapse the exclusions' broad meaning in the way the majority does contradicts axiomatic contract principles. See *Hybud Equip. Corp.*, 64 Ohio St.3d at 665, 597 N.E.2d at 1102 (court cannot engage in construction of policy language when language is clear and unambiguous). See, also, *Madison Constr. Co. v. Harleysville Mut. Ins. Co.* (1996), 451 Pa.Super. 136, 144, 678 A.2d 802, 806 (declining to divine the public policy behind an exclusion where "the policy language is clear and unambiguous" and where such an exercise would " 'convolute the plain meaning of a writing merely to find an ambiguity,' " quoting *O'Brien Energy Sys., Inc. v. Am. Employers' Ins. Co.* [1993], 427 Pa.Super. 456, 462, 629 A.2d 957, 960).

*Reasonable-Expectations Doctrine*

**{¶ 29}** Despite the foregoing substantive deficiencies, the majority nonetheless finds the effect of Highland House's and RMI's alleged history-based belief "comparable to the effect of the reasonable-expectations doctrine." While then professing to "make no determination on the merits of the reasonable-expectations doctrine," the majority proceeds in the following pages to find that the doctrine's rationale could apply to the case at bar. Such dicta serve only to confuse the state of insurance law in Ohio.

**{¶ 30}** In its earliest formation, the reasonable-expectations doctrine arose from two principles: that "an insurer will be denied any unconscionable advantage in an insurance transaction," and that "the reasonable expectations of applicants and intended beneficiaries [of an insurance policy] will be honored." Keeton, Insurance Law Rights at Variance With Policy Provisions (Part One) (1970), 83 Harv.L.Rev. 961. See, also, Keeton, Insurance Law Rights at Variance With Policy Provisions (Part Two) (1970), 83 Harv.L.Rev. 1281. Courts have disagreed over the scope and operation of this doctrine. See, generally, Swisher, A Realistic Consensus

Approach to the Insurance Law Doctrine of Reasonable Expectations (2000), 35 Tort & Ins.L.J. 729; Henderson, The Doctrine of Reasonable Expectations in Insurance Law After Two Decades (1990), 51 Ohio St.L.J. 823; Ware, A Critique of the Reasonable Expectations Doctrine (1989), 56 U.Chi.L.Rev. 1461.

{¶ 31} Some courts, for example, adhere to the belief that the doctrine operates in instances of ambiguity, permitting a court to grant coverage "if 'the policyholder, upon reading the contract language is led to a reasonable expectation of coverage.' " *Meridian Mut. Ins. Co. v. Kellman* (C.A.6, 1999), 197 F.3d 1178, 1183, quoting *Fire Ins. Exchange v. Diehl* (1996), 450 Mich. 678, 687, 545 N.W.2d 602, 606; *Max True Plastering Co. v. United States Fid. & Guar. Co.* (Okla.1996), 912 P.2d 861, 868-869.  See, also, Ware, 56 U.Chi.L.Rev. at 1467-1468, fn. 32 (collecting cases using this approach).  Other courts have adopted a more expansive understanding of the doctrine in which "even an *unambiguous* policy may be 'interpreted according to the reasonable expectations of the insured.' " (Emphasis added.) *Nelson v. Becton* (C.A.8, 1991), 929 F.2d 1287, quoting *Atwater Creamery Co. v. W. Natl. Mut. Ins. Co.* (Minn.1985), 366 N.W.2d 271, 277.  See, also, Ware, 56 U.Chi.L.Rev. at 1469-1472, fn. 40 (collecting cases adopting a "fine-print" approach in which terms buried in a policy will not be enforced when they conflict with an insured's reasonable expectations) and 1472-1475, fn. 54 (collecting cases adopting a "whole-transaction" approach in which courts will also consider insurers' marketing patterns and general practices in deciding whether policy terms should be enforced). This court has mentioned the doctrine recently in *Davidson v. Motorists Mut. Ins. Co.* (2001), 91 Ohio St.3d 262, 269-270, 744 N.E.2d 713, 719.

{¶ 32} Setting aside the curious technique of devoting several pages of an opinion to a doctrine that the opinion expressly declines to rely upon, it is unclear what form of the rejected doctrine the majority finds *potentially* applicable to this case.  The majority cites both Highland House's and RMI's alleged *belief* of coverage (without record evidence) and "the importance of interpreting ambiguities

14

in insurance contracts in favor of the insured." If the majority were confident in its decision that the exclusions are indeed ambiguous, it is equally unclear why the majority would resort to discussing parties' *beliefs* when Ohio *already recognizes* that courts shall construe ambiguous insurance contract language in favor of the insured and strictly against the insurer. See, *e.g.*, *Faruque v. Provident Life & Acc. Ins. Co.* (1987), 31 Ohio St.3d 34, 31 OBR 83, 508 N.E.2d 949, syllabus.

**{¶ 33}** In any event, I would not reach the questions of the applicability and the scope of the reasonable-expectations doctrine here because the facts of this case would not support it. That is, even if Highland House and RMI subjectively believed that coverage would extend to a carbon monoxide leak, such an expectation must nonetheless have been objectively *reasonable* under the doctrine. And given that the language employed in the pollution exclusion *on its face* is *not* limited to environmental-type pollution, I would conclude that this subjective expectation of coverage is not objectively reasonable under the terms of the policies.

**{¶ 34}** For the foregoing reasons, I would hold that the pollution exclusions in the insurance policies preclude coverage. Because Indiana Insurance was entitled to judgment as a matter of law, I would affirm the judgment of the court of appeals.

MOYER, C.J., concurs in the foregoing dissenting opinion.

———————————

*Benesch, Friedlander, Coplan & Aronoff, LLP, David W. Mellot* and *Mark D. Tucker*, for appellants.

*Green & Green* and *Thomas M. Green*, for appellee.

*Robert P. Rutter*, urging reversal for *amicus curiae* Ohio Academy of Trial Lawyers.

*Davis & Young* and *David J. Fagnilli*, urging affirmance for *amicus curiae* Insurance Environmental Litigation Association.

*Baker, Dublikar, Beck, Wiley & Mathews* and *James P. Hanratty*, urging affirmance for *amicus curiae* Ohio Association of Civil Trial Attorneys.

_____