**NATIONAL UNION FIRE INSUR-ANCE CO. OF PITTSBURGH, PENNSYLVANIA, Plaintiff,**

v.

**AMERICAN RE–INSURANCE CO., Defendant.**

No. 03 Civ. 6999(DC).

United States District Court, S.D. New York.

Jan. 3, 2005.

Edwards & Angell, LLP, by Vincent J. Vitkowsky, Esq., Michael Thompson, Esq., New York, NY, for Plaintiff.

Rubin, Fiorella & Friedman, LLP, by Bruce M. Friedman, Esq., Ricardo Sanchez, Esq., New York, NY, for Defendant.

### OPINION

CHIN, District Judge.

In this diversity action for breach of contract, two insurance companies dispute the applicability of a pollution exclusion clause of a reinsurance policy. Defendant American Re–Insurance Company ("American Re") moves for summary judgment pursuant to Fed.R.Civ.P. 56 and plaintiff National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") cross-moves to strike American Re's second affirmative defense. For the reasons that follow, National Union's motion to strike is granted and American Re's motion for summary judgment is denied.

### STATEMENT OF THE CASE

#### A. *The Facts*

The facts are drawn from the pleadings, various affidavits, and the parties' Rule 56.1 statements. They are largely undisputed and are summarized as follows:

#### 1. *The Milacron Policy*

National Union is an insurance company organized and licensed under the laws of Pennsylvania, with its principal place of business in New York. (Pl.'s 56.1 Statement ¶ 1).[1] For a period commencing on

---

**1.** Where one parties' 56.1 Statement is cited, the other side has not disputed the facts alleged, unless otherwise indicated.

April 1, 1994, National Union's underwriting office in Cleveland, Ohio issued a primary commercial general liability policy (the "Milacron policy") to Cincinnati Milacron, Inc. ("Milacron"), an Ohio corporation that manufactures, designs, and sells, among other things, machine tools, plastic injection molding machines, coordinate measuring machines, and flexible manufacturing systems. (Miller Aff. Ex. 1). The Milacron policy provided Milacron with coverage of up to $5 million after Milacron's $5 million self-insured aggregate retention was exhausted. (Pl.'s 56.1 Statement ¶ 4). The Milacron policy contained a pollution exclusion clause (the "National Union pollution exclusion"), titled a "Total Pollution Exclusion." (*Id.*). The National Union pollution exclusion excludes:

> Bodily injury or property damage which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, disposal, seepage, migration, release or escape of pollutants at any time.

(*Id.;* Jacobi Aff. Ex. A). The term "pollutants" is defined as "any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed." (Jacobi Aff. Ex. A).

### 2. The Reinsurance Policy

■ American Re is a reinsurance company organized and licensed under the laws of Delaware, with its principal place of business in New Jersey. (Pl.'s 56.1 Statement ¶ 2). On March 1, 1994, National Union's Cleveland, Ohio office sought facultative reinsurance on the Milacron policy from American Re's Columbus,

Ohio office.[2] (*Id.* ¶ 5). After an exchange of facsimiles between the parties, an agreement was reached for American Re to reinsure the Milacron policy. (*Id.* ¶ 5). The certificate of facultative reinsurance that American Re issued to National Union (the "reinsurance policy") provided $4 million in coverage to National Union in excess of the first $1 million of National Union's coverage. (Def.'s 56.1 Statement ¶¶ 3, 5). The reinsurance policy included separate asbestos and pollution exclusion clauses. (*Id.* ¶ 5; Miller Aff. Ex. 3). The pollution exclusion clause attached to the reinsurance policy (the "American Re pollution exclusion") excludes coverage for:

> A. The contamination of any environment by pollutants that are introduced at any time, anywhere, in any way;
>
> B. Any bodily injury, personal injury, property damage, costs of other loss of damage arising out of such contamination, including but not limited to cleaning or remedying or detoxifying such contamination; or
>
> C. Payment of sums related to (1) the investigation or defense of any loss, injury or damage or (2) payment of any cost, fine or penalty or (3) payment of any expense involving a claim or suit related to A or B above.

(Miller Aff. Ex. 3). "Contamination" is defined as "any unclean or unsafe or damaging or injurious or unhealthful condition arising out of the presence of pollutants, whether permanent or transient in any environment." (*Id.*). "Environment" is defined as:

> any person, any manmade object or feature, animals, crops and vegetation, land, bodies of water, underground wa-

---

**2.** Facultative reinsurance is reinsurance in part or in whole of a particular policy or policies, as opposed to treaty reinsurance, which involves an ongoing agreement whereby the reinsurer agrees to indemnify the ce-

dant for an entire "book" of the ceding insurer's underwriting activities for designated lines of insurance. *See* Barry R. Ostrager & Thomas R. Newman, *Handbook on Ins. Coverage Disputes* § 15.03[a] (12th ed.2004).

ter or water table supplies, air and other feature of the earth or its atmosphere, whether or not altered, developed or cultivated, including, but not limited to any of the above, owned, controlled, or occupied by the insured.

(*Id.*). "Pollutants" is defined as "smoke, vapors, soot, fumes, acids, sounds, alkalies, chemicals, liquids, solids, gases, thermal pollutants, and all other irritants or contaminants." (*Id.*). The parties agree that the effective date of the reinsurance policy is April 1, 1994, although the date at the bottom of the first page of the reinsurance policy and each of the endorsements—including the asbestos and pollution exclusions—is July 18, 1994. (*Id.*; Pl.'s 56.1 Statement ¶ 5). American Re did not provide a copy of the American Re pollution exclusion in its initial facsimile to National Union, but American Re did inform National Union in facsimiles on March 28 and 31, 1994 that the reinsurance would include exclusions for asbestos and pollution.[3] (Jacobi Aff. Exs. E, G).

### 3. *The Milacron Lawsuits*

In or about 1996, several employees or former employees of General Motors Corporation ("GM") who worked at various plants in Flint, Michigan filed lawsuits in Michigan against GM and Milacron alleging that they had contracted respiratory illnesses from exposure to certain metalworking fluids Milacron supplied to GM over an extended period of time. (Def.'s 56.1 Statement ¶¶ 6, 7; Jacobi Aff. Exs. I, J). In addition to supplying GM with chemicals, from about 1988, Milacron acted as a chemical manager for GM and provided on-site employees who measured concentration levels and mixed fluids. (Def.'s 56.1 Statement ¶ 7). Claimants were al-

legedly exposed to machining and/or metal working fluids that were fed to the machines by lines from open pits containing coolant, antibacterial and anti-fungal agents, and other hazardous substances. (Pl.'s 56.1 Statement ¶ 7). The claimants also alleged that Milacron mismanaged the open pits by failing to (1) conduct the metalworking operations behind air tight doors; (2) use blowers to push mist-filled air away from workers; and (3) monitor and control the presence and/or growth of bacteria and/or fungus in the metalworking fluids. (*Id.* ¶¶ 7, 8). The claimants alleged various theories of liability, including products liability and negligence for bodily injury. (Def.'s 56.1 Statement ¶ 6). At least four separate lawsuits, including three class actions, were filed in various courts in Michigan. (Jacobi Aff. Exs. I, J, L).

At the conclusion of discovery, National Union determined that there was a high probability of a verdict in favor of the plaintiff employees and attempted to settle the claims against Milacron. (Pl.'s 56.1 Statement ¶ 10). National Union considered the application of the National Union pollution exclusion when contemplating whether to settle the Milacron claims and determined that a settlement was in its best interest, notwithstanding National Union's pollution exclusion. (*Id.* ¶ 11). In or about February 2003, Milacron settled with the underlying claimants, agreeing to pay approximately $19 million. (*Id.* ¶ 10).

### 4. *National Union Seeks Reimbursement*

Following the settlement, National Union billed American Re for its purported share under the reinsurance policy. (*Id.*

---

**3.** National Union asserts that it did not receive a copy of the American Re pollution exclusion clause until July 2004. (Pl.'s 56.1 Statement ¶ 6). American Re does not con-

test this, but denies that National Union did not have notice or prior knowledge of the text of its pollution exclusion. (Def.'s Resp. to Pl.'s 56.1 Statement at 4).

¶ 12). National Union submitted proofs in support of its claim for reimbursement in the amount of $4,277,654.57, representing American Re's share of the loss.[4] (*Id.*). Subsequent to its submission, representatives from National Union met with representatives from American Re and discussed, among other things, the two pollution exclusion policies. (*Id.*). American Re denied coverage in a letter dated July 17, 2003. (*Id.* ¶ 13; Miller Aff. Ex. 4). According to American Re, it denied coverage because, *inter alia:*

> [T]he pollution exclusion in the [reinsurance policy] clearly indicates an intent between the parties that [American Re's] liability would not follow that of [National Union's] with respect to the application of [National Union's] pollution exclusion. The [American Re] exclusion clearly evidences the intent to exclude coverage for claims alleging bodily injury to persons exposed to chemicals.

(Miller Aff. Ex. 4). After additional discussion, the parties were unable to agree on the applicability of the respective pollution exclusions and this lawsuit followed. (Pl.'s 56.1 Statement ¶ 14).

**B. *Procedural History***

National Union filed this action on September 10, 2003, alleging breach of contract. The case was assigned to the Honorable Kimba M. Wood. On December 24, 2003, American Re moved for summary judgment. On January 21, 2004, National Union moved to strike American Re's second affirmative defense, which asserted that the American Re pollution exclusion bars coverage of National Union's reinsurance claims. On April 27, 2004, after re-

viewing the briefing on the motions, Judge Wood stayed discovery. On October 14, 2004, Judge Wood recused herself from the case and it was re-assigned to the undersigned.

**DISCUSSION**

American Re moves for summary judgment arguing that National Union's claim for reimbursement is barred based on the pollution exclusion in the reinsurance policy. National Union cross-moves to strike American Re's second affirmative defense. National Union essentially makes two arguments: first, that American Re's pollution exclusion clause does not bar coverage of injuries arising from indoor exposure to fumes from routine industrial work; and second, under the "follow the fortunes" doctrine, American Re is required to follow National Union's good faith settlement decision. American Re argues that the American Re pollution exclusion clause is broader than the National Union pollution exclusion and bars recovery under these facts, and that the "follow the fortunes" doctrine does not apply because the doctrine does not create coverage where none exists.

Three issues are presented: first, whether New York or Ohio law applies; second, whether the American Re pollution exclusion bars recovery by National Union; and third, whether the "follow the fortunes" doctrine requires reimbursement to National Union by American Re. After first deciding the choice of law issue, I will set out the applicable law and then address the merits.

---

**4.** American Re does not dispute that National Union claims it is owed $4,277,654.57, but it maintains that even if this Court determines that National Union is entitled to reimbursement under the reinsurance policy, a dispute remains as to the whether this amount properly allocates among all implicated direct policy periods. (*See* Def.'s Resp. to Pl.'s Statement of Material Facts at 9).

## A.  *Choice of Law*

██    In analyzing the choice of law question in a diversity case, a federal court applies the law of the forum state. *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel,* 346 F.3d 360, 365 (2d Cir.2003); *Tri–State Employment Servs., Inc. v. Mountbatten Sur. Co.,* 295 F.3d 256, 261 (2d Cir.2002); *Campbell v. Metropolitan Prop. & Cas. Ins. Co.,* 239 F.3d 179, 186 (2d Cir.2001).   In contract cases, New York courts apply a "center of gravity" or "grouping of the contacts" test and consider "a variety of significant contacts, including the place of contracting, the places of negotiation and performance, and the domicile or business of the contracting parties." *Tri–State Employment,* 295 F.3d at 260–61 (citing *In re Allstate Ins. Co. and Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993)); *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539 (2d Cir.1997); *Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1030–31 (2d Cir.1996).

██    Here, the most significant contacts are in Ohio. While National Union is headquartered in New York, the reinsurance policy was issued in Ohio and negotiated between Ohio brokers for National Union and American Re. The insured, Milacron, is an Ohio corporation and the policy between Milacron and National Union was issued by National Union's Ohio office. While the events giving rise to the Milacron lawsuits took place at GM plants in Michigan, neither side has argued that Michigan law applies, and the events surrounding the insurance and reinsurance contracts took place in Ohio. The contacts most significant to this insurance case are Ohio contacts and Ohio has the greatest interest in the outcome of this action.

Accordingly, Ohio and not New York law applies.

## B.  *Applicable Law*

### 1.  *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248–49, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *accord Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991); *St. Marys Foundry, Inc. v. Employers Ins. of Wausau,* 332 F.3d 989, 991–92 (6th Cir. 2003).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.,* 475 U.S. at 586, 106 S.Ct. 1348.  There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.  As the Court held in *Anderson,* "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

### 2. Reinsurance and "Follow the Fortunes" Doctrine

█ "Reinsurance is a contractual arrangement whereby one insurer (the ceding insurer) transfers all or a portion of the risk it underwrites pursuant to a policy or group of policies to another insurer (the reinsurer)." Barry R. Ostrager & Thomas R. Newman, *Handbook on Ins. Coverage Disputes* § 15.01[a] (12th ed.2004) (citing *Colonial Am. Life Ins. Co. v. Commissioner*, 491 U.S. 244, 244, 109 S.Ct. 2408, 105 L.Ed.2d 199 (1989)). "The scope of the risks assumed by a reinsurer depends upon the terms of the policies that are reinsured." *Id.* (citing *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 806–07, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993)). While the reinsurer is not required to pay for losses that are not covered under the underlying policy, "[a] reinsurer cannot second guess the good faith liability determinations made by its reinsured, or the reinsured's good faith decision to waive defenses to which it may be entitled." *Id.* § 15.01[b] (quoting *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 280 (2d Cir.1992), *cited in Int'l Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London*, 868 F.Supp. 917, 921 (S.D.Ohio 1994)).

█ The "follow the fortunes" doctrine obligates the reinsurer to indemnify the ceding insurer for any payments the ceding insurer makes for claims covered by the underlying insurance. *Id.* § 16.01[a]. "The purpose of this doctrine is to prevent the reinsurer from second-guessing the settlement decisions of the reinsured, thereby promoting good faith settlements by the reinsured." *North River Ins. Co. v. Employers Reins. Corp.*, 197 F.Supp.2d 972, 978 (S.D.Ohio 2002); *see also id.* (doctrine "preclude[s] wasteful relitigation by a reinsurer of defenses to

underlying policy coverage in cases where the ceding insurer has in good faith paid a settlement"). The Second Circuit has held that the "follow the fortunes" doctrine "simply requires payment where the cedant's good-faith payment is at least arguably within the scope of the insurance coverage that was reinsured." *Mentor Ins. Co. (U.K.) v. Norges Brannkasse*, 996 F.2d 506, 517 (2d Cir.1993), *cited in Int'l Surplus Lines Ins. Co.*, 868 F.Supp. at 920. "This standard is purposefully low" and the decision making process of the ceding insurer is not subject to a de novo review. *Int'l Surplus Lines Ins. Co.*, 868 F.Supp. at 921.

### 3. Insurance Policies and Pollution Exclusions

█ "In Ohio, normal rules of contract construction apply to the interpretation of insurance policies." *St. Marys Foundry, Inc.*, 332 F.3d at 992. Ohio courts first determine whether contract terms are reasonably susceptible to more than one meaning, and thus ambiguous. *Id.* If the terms of a contract are ambiguous the court determines the meaning of the contract. *St. Marys Foundry, Inc.*, 332 F.3d at 992.

█ In accordance with general contract construction principles, insurance policies are interpreted "strictly against the insurer, and any ambiguity will be construed in favor of the insured." *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 757 N.E.2d 329, 333 (2001). "It is not the responsibility of the insured to guess whether certain occurrences will or will not be covered based on nonspecific and generic words or phrases that could be construed in a variety of ways. Thus, in order to defeat coverage, the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the

only one that can fairly be placed on the language in question." *Id.*, 757 N.E.2d at 332 (internal quotation omitted).

■ Ohio principles of construction of an insurance contract apply to cases where the insured is a sophisticated, large corporation, or to reinsurance policies issued to self-insured employers. *Employers Reinsurance Corp. v. Worthington Custom Plastics, Inc.*, 109 Ohio App.3d 550, 672 N.E.2d 734, 740 n. 2 (1996) (reinsurance policy ambiguity construed in favor of self-insured corporation); *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St.3d 657, 597 N.E.2d 1096, 1102 (1992).

■ Historically, pollution exclusion clauses were used to avoid the "enormous expense and exposure resulting from the 'explosion' of *environmental* litigation." *Andersen*, 757 N.E.2d at 334 (internal quotations omitted) (emphasis in original). A court "would be remiss" to "simply look to the bare words of the exclusion, ignore its *raison d'etre*, and apply it to situations [that] do not remotely resemble traditional environmental contamination." *Id.* Because a pollution exclusion clause negates coverage, it "must be stated clearly in explicit wording setting forth with specificity exactly what is to be excluded." *St. Marys Foundry, Inc.*, 332 F.3d at 992 (quoting *River Servs. Co. v. Hartford Accident & Indem. Co.*, 449 F.Supp. 622, 626 (N.D.Ohio 1977)). "The insurer, not the insured, bears the burden of proving the applicability of an exclusion in the policy." *Id.* at 993 (quoting *Cont'l Ins. Co. v. Louis Marx & Co.*, 64 Ohio St.2d 399, 415 N.E.2d 315, 317 (1980)). Insurance policy exclusions must be "clear and exact" and if the exclusion is ambiguous, it will be construed "in favor of affording coverage to the insured." *Id.*

## C. Application

### 1. American Re Pollution Exclusion Clause Does Not Bar Recovery by National Union

■ The threshold question is whether the language in the American Re pollution exclusion unambiguously excludes coverage for damages caused by prolonged exposure to certain metalworking fluids. I conclude that, under principles of Ohio insurance contract law, the American Re pollution exclusion is ambiguous.

■ There is some support in case law for American Re's position that the broad language of its pollution exclusion covers circumstances such as those that gave rise to the Milacron claims. This support, however, does not come from Ohio, or New York, for that matter. Ohio law requires that a pollution exclusion state clearly in explicit wording and set forth with specificity exactly what is to be excluded. *See, e.g., St. Marys Foundry, Inc.*, 332 F.3d at 992. If there is ambiguity as to whether a particular event is encompassed by a pollution exclusion, that ambiguity is construed in favor of the insured. Here, the language of the American Re pollution exclusion is ambiguous because it is overly broad and does not exclude coverage with the required specificity. In addition, facts giving rise to this claim are not the type of events contemplated by insurance contracts—or reinsurance contracts—that contain pollution exclusion clauses.

#### a. The Language is Overly Broad

This Court recently examined a pollution exclusion clause with a definition of "pollutants" that is similar to the definition in the American Re pollution exclusion. *See Herald Square Loft Corp. v. Merrimack Mutual Fire Ins. Co.*, 344 F.Supp.2d 915 (S.D.N.Y.2004). In that case, the definition of pollutants was so broad that "ambi-

guity [was] created" when applied to the release of leaded dust. *Id.*, 344 F.Supp.2d at 918–19. The rest of the American Re pollution exclusion is even broader than the pollution exclusion the Court examined in *Herald Square Loft Corp.* and leads to a similar result.

In addition to the broad definition of "pollutants," the American Re pollution exclusion also extends the exclusion's application to pollutants—"introduced at any time, anywhere, in any way." (Miller Aff. Ex. 3). It contains a broader definition of "contamination"—"any unclean or unsafe or damaging or injurious or unhealthful condition arising out of the presence of pollutants, whether permanent or transient in any environment." (*Id.*). It also contains a broader definition of "environment"—

> any person, any manmade object or feature, animals, crops and vegetation, land, bodies of water, underground water or water table supplies, air and other feature of the earth or its atmosphere, whether or not altered, developed or cultivated, including, but not limited to any of the above, owned, controlled, or occupied by the insured.

(*Id.*). Applied literally, the American Re pollution exclusion is broader than many pollution exclusion clauses, including the National Union pollution exclusion. *See Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383–385, 763 N.Y.S.2d 790, 795 N.E.2d 15 (2003) (describing various industry standard pollution exclusion clauses); Ostrager & Newman, § 10.02 (same).

The American Re pollution exclusion is limitless and cannot literally mean what it says. Literally construed, the American Re pollution exclusion would encompass everything from ordinary household dust to large scale toxic environmental disasters. Several courts have commented on this scenario and found such a result unacceptable. *See Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir.1992) ("reading the clause broadly would bar coverage" for one who slips and falls on a bottle of spilled Drano or who sustains injury from chlorine in a pool); *Herald Square Loft Corp.*, 344 F.Supp.2d at 918–19; *Roofers' Joint Training, Apprentice & Educ. Comm. of Western N.Y. v. Gen. Accident Ins. Co. of America*, 275 A.D.2d 90, 92–93, 713 N.Y.S.2d 615 (4th Dep't 2000) ("term 'pollutant' is ambiguous because there is virtually no substance or chemical in existence that is not an 'irritant or contaminant' "); *see also Andersen*, 757 N.E.2d at 334 (court "must take the opportunity to prevent an absurd and unreasonable result—one that was never clearly intended by [the parties]").

Even the parties were aware that the American Re pollution exclusion was not intended to be as broad as its words allow. This is evidenced by the fact that the facultative reinsurance American Re issued to National Union had a separate asbestos exclusion, in addition to the pollution exclusion.[5] (*See* Miller Aff. Ex. 3). If a literal interpretation were applied to the American Re pollution exclusion, there would be no need for this additional asbestos exclusion, for the pollution exclusion excludes coverage for "bodily injury" arising from "contamination" by "vapors ... and all other irritants or contaminants." (*Id.*). Asbestos clearly falls into this definition if it is literally interpreted. *See Sphere Drake Ins. Co. v. Y.L. Realty Co.*,

---

5. The American Re asbestos exclusion precluded coverage for "bodily injury, personal injury, or property damage arising out of ... inhaling, ingesting or prolonged physical exposure to asbestos ... the manufacture, transportation, storage, or disposal of asbestos." (Miller Aff. Ex. 3).

990 F.Supp. 240, 244 (S.D.N.Y.1997); Ostrager & Newman, § 10.02[d][3] (citing different results among courts when addressing whether coverage can be negated under a pollution exclusion clause for damages arising out of asbestos exposure).

Ambiguity is created because the pollution exclusion could reasonably be understood by National Union in two different ways: First, in the traditional understanding that pollution exclusion clauses only exclude coverage for traditional environmental pollution; *see Andersen*, 757 N.E.2d at 334; and second, in a literal, but broader, understanding that would exclude coverage for any range of injuries or damages. (*See* Def.'s Br. at 12, 17–19) (citing cases).

This ambiguity must be resolved in favor of National Union, as the insured, because American Re cannot establish "that [its] interpretation is the only one that can fairly be placed on the language in question." *Andersen*, 757 N.E.2d at 332 (citation omitted) ("[I]f a policy does not plainly exclude a claim from coverage, then an insured may infer that the claim will be covered."). Hence, as a matter of law, American Re cannot use its pollution exclusion as a basis for denying payment under the reinsurance policy.

b. ***The Underlying Facts Giving Rise to the Claim do Not Qualify as Environmental Pollution***

■ For the American Re pollution exclusion clause to apply, the underlying facts giving rise to the Milacron lawsuits would have to fall within the rubric of environmental pollution. A review of the parties' submissions, including attached complaints and published decisions from the Milacron lawsuits, show that the injuries incurred by the plaintiffs in the Milacron lawsuits were not a result of traditional environmental pollution. (*See, e.g.,* Jacobi Aff. Exs. I, J). The claims against Milacron involved more than just injury from the metalworking fluids themselves. The claims alleged negligence in the management of the pits, including, *inter alia*, the failure of Milacron: (1) "to make sure that the pits and/or machine operations were enclosed behind airtight doors"; (2) "to make sure that blowers were used to push mist-filled air away from workers"; (3) "to hire qualified management"; and (4) "to provide protective gear to employees." (Jacobi Aff. Ex. I).

This alleged conduct and wrongdoing by Milacron is not what the insurance industry sought to preclude with pollution exclusions. *See Andersen*, 757 N.E.2d at 332 (discussing evolution of pollution exclusions). Initially, the insurance industry sought to preclude coverage only for intentional polluters, but eventually the concept evolved whereby even unintentional, gradual pollution, and environmental degradation of any type was precluded. *Id.* at 332–33; Ostrager & Newman, § 10.02. This evolution has not changed the basic justification for pollution exclusion clauses: to avoid the "enormous expense and exposure resulting from the 'explosion' of *environmental* litigation." *Andersen*, 757 N.E.2d at 334 (internal quotations omitted) (emphasis in original).

Based on the traditional understanding of pollution exclusions, it was reasonable for National Union to expect that American Re would not deny coverage based on injuries to workers exposed to metalworking fluids inside a GM manufacturing plant, particularly when this exposure was allegedly a result of improper management and control of the pits. (*See* Jacobi Aff. Exs. I, J). The alleged damage from the metalworking fluids is not environmental pollution in the accepted and historical sense of the words, as applied to pollution exclusions. *See Rybacki v. Allstate Ins.*

Co., No. 03CA0079–M, 2004 WL 894406, at *3 (Ohio Ct.App. April 28, 2004) (citing *Andersen* and distinguishing carbon monoxide emissions (not excluded by pollution exclusion) from "environmental degradation of a pollutant leak into the earth" (excluded by pollution exclusion)). Given the "history and original purposes for the pollution exclusion ... [i]t will not suffice for [American Re] to demonstrate that its interpretation is more reasonable than [National Union's]." *Andersen,* 757 N.E.2d at 333 (internal quotation and citations omitted). American Re must "establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question." *Andersen,* 757 N.E.2d at 332 (citation omitted)."

Considering the language in the American Re pollution exclusion and the facultative reinsurance in its "plain and natural meaning" "in accordance with how a reasonable policyholder would understand the language," a reasonable trier of fact could only conclude that National Union could not have reasonably expected the American Re pollution exclusion—intended to exclude coverage for environmental pollution—to bar coverage for bodily injury resulting from mismanagement, negligence, and prolonged exposure to metalworking fluids used for their intended purpose in an indoor environment. *St. Marys Foundry, Inc.,* 332 F.3d at 996–97; *see also Lumbermens Mutual Casualty Co. v. S–W Indus., Inc.,* 39 F.3d 1324, 1336 (6th Cir. 1994) (applying exclusion to fumes and dust confined to indoor plant "strains the plain meaning, and obvious intent, of the language" of the pollution exclusion clause); *Andersen,* 757 N.E.2d at 334.

The reasonable, yet differing, expectations of the parties render the American Re pollution exclusion ambiguous. This ambiguity is construed against American Re, as the insurer, and thus precludes American Re from asserting its second affirmative defense. *See Am. Fin. Corp. v. Fireman's Fund Ins. Co.,* 15 Ohio St.2d 171, 239 N.E.2d 33, 35 (1968); *Employers Reinsurance Corp.,* 672 N.E.2d at 740 n. 2. National Union's cross-motion to strike American Re's second affirmative defense is granted, as I conclude as a matter of law that the American Re pollution exclusion is ambiguous and cannot be used by American Re as a basis for denying payment under the reinsurance policy.

### 2. *American Re Must "Follow the Fortunes" of National Union*

American Re concedes that the "follow the fortunes" doctrine binds a reinsurer if "there is arguably coverage for the claim under the reinsured policy" and if the contracts provide identical coverage. (Def.'s Br. at 21). I conclude as a matter of law there was arguably coverage under the Milacron policy (the reinsured policy) and further that the Milacron policy and the reinsurance policy provide identical coverage. Although the American Re pollution exclusion does contain broader language, when the language is given a reasonable construction, the coverages are co-extensive.

■ American Re is not permitted to "avoid liability by raising policy defenses and objections that were available to the reinsured unless the reinsured pays a settlement that is clearly or manifestly outside the scope of the reinsured's policy coverage or pays a settlement that is fraudulent, collusive or in bad faith." *North River Ins. Co.,* 197 F.Supp.2d at 978; *see also Unigard Security Ins. Co. v. North River Ins. Co.,* 762 F.Supp. 566, 587 (S.D.N.Y.1991), *aff'd in part, rev'd in part,* 4 F.3d 1049 (2d Cir.1993); *Int'l Surplus Lines Ins. Co.,* 868 F.Supp. at 920. Ab-

sent such evidence, and here no such evidence has been presented, American Re is required to "follow the fortunes" of National Union under the terms of the reinsurance policy. *Int'l Surplus Lines Ins. Co.*, 868 F.Supp. at 920.

## CONCLUSION

For the foregoing reasons, American Re's motion for summary judgment is denied. National Union's cross motion to strike American Re's second affirmative defense is granted. The parties shall appear for a pre-trial conference on January 21, 2005, at 10:00 a.m.

SO ORDERED.