RALPH B. GUY, JR., Circuit Judge.
This is a diversity breach of contract action in which plaintiff Abercrombie & Fitch Co. claims defendant Federal Insurance Company improperly refused to pay legal defense costs under an executive protection insurance policy. On summary judgment, the district court ruled in favor of Abercrombie, interpreting the contract to require coverage of its defense costs. Finding no error in the district court’s interpretation, we affirm.
I.
Plaintiff Abercrombie & Fitch (Aber-crombie) contests defendant Federal Insurance Company’s (Federal) refusal to pay defense costs. of securities class actions, shareholder derivative suits, and SEC investigation initiated against Aber-crombie beginning in 2005.[1] Abercrombie had $10 million in coverage for such claims under a Federal policy, with an effective period covering the dates the claims against Abercrombie were filed. After Federal refused to pay Abercrombie’s insurance claim, Abercrombie filed a five-count federal diversity action in 2006, seeking a declaration of Federal’s obligation to pay certain defense costs under the Federal Policy, and damages for its breach of contract.[2] Federal’s answer to the complaint included a third-party complaint against National Union Fire Insur-anee Co., issuer of a separate insurance policy to Abercrombie, and a counterclaim against Abercrombie. In the counterclaim, Federal asserted Abercrombie’s breach of the Federal Policy, and sought declaratory judgment that it was not obligated to provide coverage for the Ross claims and SEC investigation. In February 2008, Federal filed a motion for summary judgment, which was denied by the district court in September 2008.[3]
Neither party contests the facts and sequence of events set out in the district court’s Opinion and Order denying Federal’s motion for summary judgment, repeated below:
Federal issued Executive Protection Portfolio Policy No. 8159-6218 (the “Federal Policy”) to Abercrombie for the Policy Period of September 1, 2004 to September 1, 2005. The Federal Policy includes an Executive Liability and Entity Securities Liability Coverage Section, which provides up to $10 million of coverage for Abercrombie, its officers and directors, for “loss ... on account of any Claim first made ... against [an insured] during the Policy Period or, if exercised, during the Extended Reporting Period, for a Wrongful Act committed, attempted or allegedly committed or attempted by [an insured] before or during the Policy Period.” As the end of the Federal Policy Period approached, Abercrombie purchased a new claims-made policy from National Union *565 Fire Insurance Company of Pittsburgh (“National Union”), with coverage effective from September 1, 2005 to September 1, 2006.
On September 2, 2005, one day after the expiration of the Federal Policy, Abercrombie was sued, along with several of its officers and directors, in a class action complaint alleging violations of federal securities laws. Certain Abercrombie shareholders subsequently filed several derivative suits, and the Securities and Exchange Commission commenced a formal investigation on November 30, 2005.
The Federal Policy permitted Aber-crombie to purchase a one-year extended reporting period (the “ERP”) that would cover claims arising after the end of the initial Policy Period, but involving conduct that occurred during the Policy Period. Abercrombie exercised the option to purchase the ERP and paid the $820,000 premium [4] on September 30, 2005, within the 30-day window provided by the Federal Policy. Abercrombie formally notified Federal of the Ross Claims by letter dated October 5, 2005.
There is no dispute that after the Ross claims were filed, and before purchasing the ERP, Abercrombie renegotiated the National Union Policy, providing that the new coverage would be excess to Federal’s primary coverage under the ERP. The agreement between National Union and Abercrombie was later memorialized in an Endorsement to the National Union Policy.[5] Endorsement No. 17 reads as follows:
In the event a Claim is made against an Insured under the policy and also under Policy No. 8159-6213 issued by Federal Insurance Company (hereinafter “Federal Policy”), alleging any Wrongful Act committed or allegedly committed prior to 9/01/2005, then such insurance as is provided by this policy shall apply only as excess over any Loss paid under such Federal Policy.
The parties agree that, had Aber-crombie purchased the ERP and not written the National Union Policy to be excess, the National Union and Federal policies would both be primary. Federal maintains that, by shifting the burden of primary coverage to Federal, Aber-crombie prejudiced Federal’s right to recover from National Union, and that such conduct constitutes a material breach of the insurance contract and a bar to coverage. Specifically, Federal claims that Abercrombie breached Section 16(d) of the Policy, which states:
The Insureds agree to provide the Company [Federal] with all information, assistance and cooperation which the Company may reasonably require and agree that in the event of a Claim the Insureds will do nothing that could prejudice the Company’s position or its potential or actual rights of recovery.
Abercrombie contends that the Federal Policy expressly permitted Abercrom-bie to structure additional or subsequent coverage as excess to Federal’s primary coverage. Specifically, the Federal Policy states, in Section 18:
If any Loss under this coverage section is insured under any other valid *566 insurance policy(ies), then this coverage section shall cover such Loss, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such Loss is in excess of the applicable retention (or deductible) and limit of liability under such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided in this coverage section [the Executive Liability and Entity Securities Liability Coverage section],
(Federal Policy, Doc. # 85-2).
The parties differ over the meaning of this provision. Federal maintains that the provision applies only to coverage that is exclusively excess; Abercrombie contends that this section gives it the right to purchase primary coverage that would be excess only as to the Federal ERP.
Importantly, the parties do not disagree on several key facts relating to coverage. For example, there is no dispute that the Ross Claims fall within the coverage provided by the ERP, as they allege wrongful conduct occurring during the initial Policy Period. Also, Federal does not allege that Abercrombie failed to exercise the ERP option in accordance with Section 12 of the Policy, or to provide timely notice of the Ross Claims under Section 15.
Federal now seeks judgment as a matter of law and a declaration that the Federal Policy does not provide coverage to Abercrombie for the Ross Claims, based solely on Abercrombie’s conduct in writing the National Union Policy to be excess to that of Federal, allegedly cutting off Federal’s right of contribution in purported breach of Section 16(d) of the Federal Policy.
(Footnote omitted).
Applying Ohio law to the interpretation of the Federal Policy, the district court determined that the sections of the insurance contract in dispute could reasonably be interpreted “in such a manner that requires Federal to provide coverage for the Ross claims.” The district court also found it could not dismiss the bad faith claim contained in Abercrombie’s amended complaint. Accordingly, the district court denied Federal’s motion for summary judgment.
Following its ruling on Federal’s motion for summary judgment, the district court requested memoranda from the parties briefing any issues remaining in connection with Abercrombie’s pending motion for partial summary judgment. In January 2009, the district court granted Aber-crombie’s motion, entering its declaration that Abercrombie was entitled to advancement of four categories of costs from Federal.[6] Federal filed its timely notice of *567 appeal from the district court’s January order and “all interlocutory orders leading thereto, including but not limited to the Order dated September 30, 2008, 2008 WL 4425523, denying Federal’s motion for summary judgment.”
II.
A. Jurisdiction
A preliminary issue raised by this appeal is our jurisdiction over it. After Federal filed this appeal, Abercrombie moved to dismiss, asserting that the district court’s January 2009 interlocutory order was not an appealable injunction under 28 U.S.C. § 1292(a)(1).[7]
A motions panel first considered this issue and in June 2009 denied the motion without prejudice, noting decisions from the Ninth and Eleventh Circuits allowing the immediate appeals of interlocutory orders directing insurers to advance litigation expenses.[8] Abercrombie maintains in its merits brief that the January 2009, non-final order of the district court is neither injunctive nor meets the requirements of Carson v. American Brands, Inc., 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981) for other non-final orders: that a district court’s appealable interlocutory order have a “serious, perhaps irreparable consequence,” and can only be “effectually challenged” by immediate appeal. Id. at 84, 101 S.Ct. 993 (quoting Baltimore Contractors v. Bodinger, 348 U.S. 176, 181, 75 S.Ct. 249, 99 L.Ed. 233 (1955)).
In Pacific Insurance Co. v. General Development Corp., 28 F.3d 1093, 1096 (11th Cir.1994), the Eleventh Circuit considered whether an interlocutory partial summary judgment order directing insurance payments to insureds, pending resolution of the insurer’s claim for rescission of the policy, was appealable under § 1292(a)(1). In its summary ruling that it had jurisdiction over the appeal, the court relied on National Union Fire Insurance Co. v. Sahlen, 999 F.2d 1532 (11th Cir.1993).
Salden is a case in which the plaintiff insurer filed a complaint for rescission of an insurance contract based on the defendants’ alleged misrepresentations in the application for insurance, which was ultimately resolved in the insurer’s favor on its motion for summary judgment. Although it entered judgment, the district court reserved jurisdiction over the insurer’s claim for reimbursement of payments for defense costs it had made prior to filing its suit for recission. On appeal, concerned that this reservation of jurisdiction over the reimbursement issue precluded appellate jurisdiction, the Eleventh Circuit submitted a sua sponte question of jurisdiction to the litigants. Citing Gon v. First State Ins. Co., 871 F.2d 863 (9th Cir.1989), the panel determined that the district court’s rulings in connection with the insureds’ motion for partial summary judgment requesting payment of defense costs pending a decision on the complaint for rescission constituted grants of or modifications of an injunction, over which it had jurisdiction under § 1292(a)(1). Gon similarly held that a district court’s order modifying its own earlier direction to an *568 insurer to pay defense expenses in certain litigation as they were incurred was an appealable order under § 1292(a)(1). See Gon, 871 F.2d at 866.[9]
As argued by Federal, the relief sought by Abercrombie’s amended complaint includes a judgment “enjoining Federal from failing and refusing to pay” certain defense costs. (Emphasis added.) Additionally, the order appears to fit the requirements set forth in Gon — citing 16 C. Wright, A. Miller, E. Cooper, & E. Gress-man, Federal Practice & Procedure: Jurisdiction § 3922 at 29 (1977) — that it is enforceable by contempt, and is “designed to accord or protect some or' all of the substantive relief sought by a complaint in more than temporary fashion.” Gon, 871 F.2d at 865. In line with Gon and Sahlen, we determine that the district court’s grant of partial summary judgment was an injunctive order, over which we have jurisdiction under 28 U.S.C. § 1292(a)(1).
B. Breach of Contract
We next turn to the merits of the appeal. Under Fed. R. Civ. P. 56(c), summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Our review of both the district court’s interpretation of the insurance contract and its summary judgment determinations is de novo.[10] See Duane Mgmt. Co. v. Prudential Ins. Co., 29 F.3d 245, 248 (6th Cir.1994). There is no dispute here that Ohio law governs the interpretation of the Federal Policy. As quoted by the district court, under Ohio law, “[i]n order to defeat coverage, the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question.” Andersen v. Highland House Co., 93 Ohio St.3d 547, 757 N.E.2d 329, 332 (2001) (internal quotation marks and citation omitted).
Federal relies on Federal Policy provision 16(d) for its claim that the district court erred in finding that Abercrombie did not commit a breach of the Federal Policy. Federal repeatedly invokes the language in § 16(d) that “in the event of a Claim the Insureds will do nothing that could prejudice [Federal’s] position or its potential or actual rights of recovery,” asserting that Abercrombie’s actions in electing the extension of coverage from Federal, while also negotiating with National Union that Federal’s liability for coverage would be primary, violated that provision. Federal asserts that it had a “well-settled *569 right to contribution” from National Union at the time Abercrombie learned of the claims against it, as without amendment to the National Union policy, the two insurers would have been equally liable for coverage. See Buckeye Union Ins. Co. v. State Auto. Mut. Ins. Co., 49 Ohio St.2d 218, 361 N.E.2d 1052, 1055 (1977). Federal contends that Abercrombie “abrogated” its right to contribution, by retroactively “colluding” with National Union to make Federal responsible for primary coverage of defense costs. Federal states that “Section 16(d), in short, takes a snapshot of Federal’s rights on the day a Claim is made; Abercrombie is from that point obligated not to do anything that could undermine those rights.”
Abercrombie argues that' Federal has selectively quoted from the policy, taking the clause it relies on out of context. Provision (d) is the fourth of five parts of Section 16, labeled “Defense and Settlement:”
Defense and Settlement
16. (a) It shall be the duty of the Insureds and not the duty of the Company to defend Claims made against the Insureds.
(b)The Insureds agree not to settle or offer to settle any Claim, incur any Defense Costs or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the Company’s prior -written consent. The Company shall not be liable for any element of Loss incurred, for any obligation assumed, or for any admission made, by any Insured without the Company’s prior written consent. Provided the Insureds comply with Subsections 16(c) and (d) below, the Company shall not unreasonably withhold any such consent.
(c) With respect to any Claim that appears reasonably likely to be covered in whole or in part under this coverage section, the Company shall have the right and shall be given the opportunity to effectively associate with the Insureds, and shall be consulted in advance by the Insureds, regarding the investigation, defense and settlement of such Claim, including but not limited to selecting appropriate defense counsel and negotiating any settlement.
(d) The Insureds agree to provide the Company with all information, assistance and cooperation which the Company may reasonably require and agree that in the event of a Claim the Insureds will do nothing that could prejudice the Company’s position or its potential or actual rights of recovery.
(e) Any advancement of Defense Costs shall be repaid to the Company by the Insureds, severally according to their respective interests, if and to the extent it is determined that such Defense Costs are not insured under this coverage section.
Federal Policy, § 16. Abercrombie insists that this section of the policy covers its and Federal’s rights and obligations only in connection with the defense and settlement of claims made against Abercrombie, and not Abercrombie’s negotiations or agreements regarding insurance contracts and carriers.[11]
In its opinion, the district court agreed with Abercrombie that § 16 of the Federal *570 Policy related only to the defense and settlement of claims, and was not violated by Abercrombie’s actions in amending the National Union policy. The district court similarly found no bar to Abercrombie’s actions in § 18, determining that the section’s “plain language” allowed the amendment. Pointing out that § 7 of the Federal Policy (entitled “Subrogation”) governed Federal’s rights of recovery “in the event of payment under this policy,” the district court determined that “Section 16(d) can reasonably be interpreted to require the cooperation of Abercrombie in connection with the defense of a Claim, and no more.” [12]
Federal argues that the district court’s decision, in agreeing with Abercrombie, did not give effect to the Federal Policy as a whole, but improperly interpreted § 18 in isolation, without the limitation it argues is imposed by § 16. Federal cites to Ohio law standing for the proposition that courts must apply the terms of a contract as written, and cannot “read into a contract” meaning not given to the document by the parties. See Motorists Mut. Ins. Co. v. Tomanski, 27 Ohio St.2d 222, 271 N.E.2d 924, 927 (1971). Federal contends that the amendment of an existing policy (the National Union policy), that was not originally “specifically excess to the Federal Policy,” while not violative of § 18 did breach § 16’s proscription of actions which could “prejudice” Federal’s “potential or actual rights of recovery.” [13] We disagree.
Under Ohio law, we must “give the words in the policy their plain and ordinary meaning.” Minor v. Allstate Ins. Co., Inc., 111 Ohio App.3d 16, 675 N.E.2d 550, 558 (1996). We read the policy as a whole, giving effect to all of its provisions, and not interpreting any section in isolation. Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth., 78 Ohio St.3d 353, 678 N.E.2d 519, 526 (1997). Section 16 of the Federal Policy sets forth (a) whose duty it is to defend Claims; (b) that Abercrombie cannot offer to settle any Claim without Federal’s consent; (c) Federal’s involvement in investigating and settling Claims; (d) that Abercrombie will fully assist with such investigation, including doing “nothing that could prejudice [Federal’s] position or its potential or actual rights of recovery;” and (e) that Abercrombie will repay defense costs advanced by Federal if it is determined there was no coverage. It is clear that the purpose of § 16 is to enumerate the parties’ respective rights and obligations when a claim is made against an insured, and the insured is covered by the *571 policy. It does not address the parties’ rights and obligations when a policy has elapsed, a claim has been brought against a (formerly) insured, and the insured is deciding whether to elect — and how best to structure — extended insurance coverage.
As Abercrombie highlights in its briefing, Federal’s position that § 16(d) proscribes its actions in amending the insurance policy with National Union makes little sense when viewed in the context of Abercrombie’s initial decision to elect the ERP coverage. At the time the Ross claims were filed, Federal had no coverage responsibility whatsoever, as its policy had just expired. The decision by Abercrom-bie to elect the ERP after claims had been made could certainly be said to “prejudice” Federal’s “position,” under the interpretation advanced by Federal, but Federal makes no such argument. The idea that the § 16(d) language should apply to Aber-crombie’s negotiation with National Union, but not to Abercrombie’s election of the ERP, undermines Federal’s argument that § 16(d) applies to the situation at all.
There is no question that the interpretation advanced by Federal is not the only one that can “fairly be placed on the language in question.” Andersen, 757 N.E.2d at 332. We find that the district court’s interpretation of § 16, limiting the provision’s application to the defense and settlement of claims, to be entirely reasonable and supported by the language of the contract. There is nothing about § 16 that prevents Abercrombie from making fiscally driven business decisions about its insurance coverage, even if such a decision is unanticipated by an existing or past insurer. Certainly § 12 of the Federal Policy, giving Abercrombie a 30-day window in which to elect the extended coverage following the expiration of its 2004-2005 policy, contained no language limiting Aber-crombie’s ability to elect that coverage in the event that claims were made during the window period. We also note that the premium — double the premium for the first year — likely took this risk into account. As noted above, Federal nowhere contends that Abercrombie was not allowed to elect the ERP under those circumstances. Moreover, as argued by Abercrombie, a contract’s specific provisions, such as § 12 of the Federal Policy, control over a more general provision such as § 16. See Monsler v. Cincinnati Cas. Co., 74 Ohio App.3d 321, 598 N.E.2d 1203, 1209 (1991).
We note further that while Federal dates Endorsement 17 as occurring in November 2005, entirely after Abercrombie’s purchase of the extended Federal coverage, it is clear that negotiation of the amendment occurred as a part of the decision to elect the ERP. Such a business negotiation was not prohibited by the Federal Policy.[14] As the district court stated, in rejecting Federal’s arguments about § 16, “[i]t is an unreasonable interpretation of Section 16(d) to find that it requires Abercrombie to structure its insurance needs based not on its own needs and in its own best interests, but rather to minimize its insurer’s potential exposure.” In any event, even if we were to determine that § 16(d) was susceptible to more than one interpretation, strict construction of the language against the insurer is mandated by Ohio law. See Lane v. Orange Mut. Cos., 45 Ohio St.3d 63, 543 N.E.2d 488, 490 (1989).
*572 Because the Federal Policy does not impose limitations on allowable terms of insurance agreed to between Abercrombie and additional insurers, we find no error in the district court’s interpretation of the Federal Policy.
The district court is AFFIRMED.

. The securities class actions and shareholder derivative suits, filed in the Southern District of Ohio, were consolidated in the district court as Ross v. Abercrombie & Fitch Co., No. 2:05-cv-819 and In re: Abercrombie & Fitch Co. Derivative Litigation, Lead Case No. 2:05-cv-00819-EAS-TPK, and are collectively referred to as “the Ross claims.”

. In May 2007, Abercrombie filed an amended complaint, adding a count of bad faith for Federal’s refusal to pay defense costs.

.While this motion was pending, Abercrom-bie filed a motion for partial summary judgment, seeking the district court's determination that it was entitled to advancement of certain defense costs. The district court's order on Federal's motion for summary judgment indicated that it had taken Abercrom-bie's motion "under advisement” and would rule on it in a separate opinion and order.

. This premium was twice the premium for the original one-year policy.

. The agreement was negotiated between representatives for Abercrombie and National Union in late September 2005, prior to Aber-crombie's election of the Federal ERP. However, the actual issuance of Endorsement No. 17 to the National Union policy did not occur until November. In exchange for electing the Federal ERP, Abercrombie received benefits from National Union in the form of a reduced deductible and the potential for no increase in premium for subsequent policy years.

. The order stales:
Subject to the $1 million retention and the $10 million limit in Federal Policy No. 8159-62-13, Federal is hereby ORDERED to advance payment for the following categories of costs that Plaintiff has incurred and will incur in the future: 1) All reasonable costs incurred by Abercrombie or its current or former officers or directors to defend Ross v. Abercrombie, No. 2:05-cv-819 (S.D.Ohio); 2) All reasonable costs incurred by Abercrombie or its current or former officers or directors to defend In re Abercrombie & Fitch Co. Derivative Litigation, Lead Case No. 2:05-cv-819 (S.D.Ohio); and 3) All reasonable costs incurred by Abercrombie to investigate or evaluate whether it is in Abercrombie’s best interest to prosecute the claims raised in the shareholder derivative suits, up to the Policy's $250,000 limit (see Federal Policy, pp. 1 and 12); 4) All reasonable costs incurred by Abercrombie in connection with the Order Directing Private Investigation and Designating Officers to Take Testimony, SEC File No. P-1305, after November 30, 2005, the date of the Order, to the *567 extent such costs were incurred with respect to a Claim, as defined by the Federal Policy.
(Citation omitted.)

. The final judgment rule, codified at 28 U.S.C. § 1291, generally limits federal courts of appeals’ jurisdiction to final decisions of the district courts; in the next section, certain interlocutory decisions of the district courts are excepted from the rule, giving us jurisdiction over orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions. ...” 28 U.S.C. § 1292(a)(1).

. See Pac. Ins. Co. v. Gen. Dev. Corp., 28 F.3d 1093, 1096 (11th Cir.1994); Gon v. First State Ins. Co., 871 F.2d 863, 865 (9th Cir.1989).

. Additionally, in Medcom Holding Co. v. Baxter Travenol Laboratories, Inc., 984 F.2d 223, 224-25 (7th Cir.1993), the court held that it had jurisdiction over a non-final order requiring specific performance of a contract provision, but see Saber v. FinanceAmerica Credit Corp., 843 F.2d 697, 702 (3d Cir.1988) (holding an order to pay money under a settlement was a "legal remedy” and not an injunction within scope of § 1292(a)(1)).

. Although Federal filed its appeal following the district court’s decision on Abercrombie's motion for partial summary judgment, its arguments address the September 2008 decision of the district court on Federal's motion for summary judgment. Federal notes that the September order was neither final nor timely appealed, but concedes that "an appellate court, in its discretion, [may] exercise jurisdiction over issues that are not independently appealable when those issues are 'inextricably intertwined' with matters over which the appellate court properly and independently has jurisdiction,” quoting Hadix v. Johnson, 228 F.3d 662, 669 (6th Cir.2000). Because we have determined we have jurisdiction over this appeal, and the January 2009 order incorporates rulings made in the September 2008 order, we find we may consider the issues ■ presented as “inextricably intertwined.”

. Abercrombie also highlights the “deeming clause” language of § 12 of the Federal Policy, which states that claims falling within the extended coverage are deemed made during the original period of the Federal Policy (i.e. during September 1, 2004-September 1, 2005). Abercrombie asserts that because the National Union Policy was not in effect during the 2004-05 time period, National Union would have no obligation to cover a claim deemed made during that period, and Federal is sole primary insurer of the Ross claims.

. The district court cited Storer v. Ocean Accident & Guarantee Corp., 80 F.2d 470, 472 (6th Cir.1935), an action brought under Ohio law on an insurance contract, for the purposes of a cooperation clause: "(1) To require the insured to aid in preparing the case for trial and in making proper defense; and (2) to prevent collusion between the insured and a friendly claimant.” See also Lee R. Russ and Thomas F. Segalla, 14 Couch on Insurance § 199:4 (3d ed.) ("The main purpose of a cooperation clause is to prevent collusion while making it possible for the insurer to make a proper investigation.”).

. Federal cites Champion Spark Plug Co. v. Fidelity & Casualty Co., 116 Ohio App.3d 258, 687 N.E.2d 785, 793 (1996) for the holding that an insured who breaches a consent-to-settle provision is automatically barred from coverage, making the unconvincing analogy that Abercrombie's alleged breach of § 16(d) bars it from coverage for the Ross claims and related investigation. However, as shown by Abercrombie, the case of Ferrando v. Auto-Owners Mut. Ins. Co., 98 Ohio St.3d 186, 781 N.E.2d 927 (2002) added the required element of prejudice to an insurer's defense based on the cooperation clause. Abercrom-bie argues, and the district court found, Aber-crombie’s actions did not prejudice Federal's "ability to defend the Ross Claims on the merits.” Given our determination that Aber-crombie did not breach the Federal Policy, we need not further address this issue.

. We are also not persuaded by Federal's argument, citing Moskowitz v. Progressive Ins. Co., 128 Ohio Misc.2d 10, 811 N.E.2d 174, 183 (2004), that these business decisions constituted a breach of the duty of good faith and fair dealing. Moreover, Federal has waived this argument, as it did not bring it before the district court. See St. Marys Foundry, Inc. v. Employers Ins. of Wausau, 332 F.3d 989, 995 (6th Cir.2003).