NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0152n.06

No. 09-3096

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

ABERCROMBIE & FITCH CO.,

    Plaintiff-Appellee,

        v.

FEDERAL INSURANCE COMPANY,

    Defendant-Appellant.

_____/

**FILED**
**Mar 11, 2010**
LEONARD GREEN, Clerk

On Appeal from the United
States District Court for the
Southern District of Ohio at
Columbus

**Before:**      **GUY, CLAY, and KETHLEDGE**, Circuit Judges.

    **RALPH B. GUY, JR., Circuit Judge.**    This is a diversity breach of contract action in which plaintiff Abercrombie & Fitch Co. claims defendant Federal Insurance Company improperly refused to pay legal defense costs under an executive protection insurance policy. On summary judgment, the district court ruled in favor of Abercrombie, interpreting the contract to require coverage of its defense costs. Finding no error in the district court's interpretation, we affirm.

**I.**

    Plaintiff Abercrombie & Fitch (Abercrombie) contests defendant Federal Insurance Company's (Federal) refusal to pay defense costs of securities class actions, shareholder

derivative suits, and SEC investigation initiated against Abercrombie beginning in 2005.[1]

Abercrombie had $10 million in coverage for such claims under a Federal policy, with an

effective period covering the dates the claims against Abercrombie were filed.  After Federal

refused to pay Abercrombie's insurance claim, Abercrombie filed a five-count federal

diversity action in 2006, seeking a declaration of Federal's obligation to pay certain defense

costs under the Federal Policy, and damages for its breach of contract.[2]  Federal's answer to

the complaint included a third-party complaint against National Union Fire Insurance Co.,

issuer of a separate insurance policy to Abercrombie, and a counterclaim against

Abercrombie.  In the counterclaim, Federal asserted Abercrombie's breach of the Federal

Policy, and sought declaratory judgment that it was not obligated to provide coverage for the

Ross claims and SEC investigation.  In February 2008, Federal filed a motion for summary

judgment, which was denied by the district court in September 2008.[3]

Neither party contests the facts and sequence of events set out in the district court's

Opinion and Order denying Federal's motion for summary judgment, repeated below:

> Federal issued Executive Protection Portfolio Policy No. 8159-6213 (the
> "Federal Policy") to Abercrombie for the Policy Period of September 1, 2004

---

[1] The securities class actions and shareholder derivative suits, filed in the Southern District of Ohio, were consolidated in the district court as *Ross v. Abercrombie & Fitch Co.*, No. 2:05-cv-819 and *In re: Abercrombie & Fitch Co. Derivative Litigation*, Lead Case No. 2:05-cv-00819-EAS-TPK, and are collectively referred to as "the Ross claims."

[2] In May 2007, Abercrombie filed an amended complaint, adding a count of bad faith for Federal's refusal to pay defense costs.

[3] While this motion was pending, Abercrombie filed a motion for partial summary judgment, seeking the district court's determination that it was entitled to advancement of certain defense costs.  The district court's order on Federal's motion for summary judgment indicated that it had taken Abercrombie's motion "under advisement" and would rule on it in a separate opinion and order.

to September 1, 2005. The Federal Policy includes an Executive Liability and Entity Securities Liability Coverage Section, which provides up to $10 million of coverage for Abercrombie, its officers and directors, for "loss . . . on account of any Claim first made . . . against [an insured] during the Policy Period or, if exercised, during the Extended Reporting Period, for a Wrongful Act committed, attempted or allegedly committed or attempted by [an insured] before or during the Policy Period." As the end of the Federal Policy Period approached, Abercrombie purchased a new claims-made policy from National Union Fire Insurance Company of Pittsburgh ("National Union"), with coverage effective from September 1, 2005 to September 1, 2006.

On September 2, 2005, one day after the expiration of the Federal Policy, Abercrombie was sued, along with several of its officers and directors, in a class action complaint alleging violations of federal securities laws. Certain Abercrombie shareholders subsequently filed several derivative suits, and the Securities and Exchange Commission commenced a formal investigation on November 30, 2005.

The Federal Policy permitted Abercrombie to purchase a one-year extended reporting period (the "ERP") that would cover claims arising after the end of the initial Policy Period, but involving conduct that occurred during the Policy Period. Abercrombie exercised the option to purchase the ERP and paid the $820,000 premium[4] on September 30, 2005, within the 30-day window provided by the Federal Policy. Abercrombie formally notified Federal of the Ross Claims by letter dated October 5, 2005.

There is no dispute that after the Ross claims were filed, and before purchasing the ERP, Abercrombie renegotiated the National Union Policy, providing that the new coverage would be excess to Federal's primary coverage under the ERP. The agreement between National Union and Abercrombie was later memorialized in an Endorsement to the National Union Policy.[5] Endorsement No. 17 reads as follows:

---

[4]This premium was twice the premium for the original one-year policy.

[5]The agreement was negotiated between representatives for Abercrombie and National Union in late September 2005, prior to Abercrombie's election of the Federal ERP. However, the actual issuance of Endorsement No. 17 to the National Union policy did not occur until November. In exchange for electing the Federal ERP, Abercrombie received benefits from National Union in the form of a reduced deductible and the potential for no increase in premium for subsequent policy years.

In the event a Claim is made against an Insured under the policy and also under Policy No. 8159-6213 issued by Federal Insurance Company (hereinafter "Federal Policy"), alleging any Wrongful Act committed or allegedly committed prior to 9/01/2005, then such insurance as is provided by this policy shall apply only as excess over any Loss paid under such Federal Policy.

The parties agree that, had Abercrombie purchased the ERP and not written the National Union Policy to be excess, the National Union and Federal policies would both be primary. Federal maintains that, by shifting the burden of primary coverage to Federal, Abercrombie prejudiced Federal's right to recover from National Union, and that such conduct constitutes a material breach of the insurance contract and a bar to coverage. Specifically, Federal claims that Abercrombie breached Section 16(d) of the Policy, which states:

The Insureds agree to provide the Company [Federal] with all information, assistance and cooperation which the Company may reasonably require and agree that in the event of a Claim the Insureds will do nothing that could prejudice the Company's position or its potential or actual rights of recovery.

Abercrombie contends that the Federal Policy expressly permitted Abercrombie to structure additional or subsequent coverage as excess to Federal's primary coverage. Specifically, the Federal Policy states, in Section 18:

If any Loss under this coverage section is insured under any other valid insurance policy(ies), then this coverage section shall cover such Loss, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such Loss is in excess of the applicable retention (or deductible) and limit of liability under such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided in this coverage section [the Executive Liability and Entity Securities Liability Coverage section].

(Federal Policy, Doc. #85-2).

The parties differ over the meaning of this provision. Federal maintains that the provision applies only to coverage that is exclusively excess; Abercrombie contends that this section gives it the right to purchase primary coverage that would be excess only as to the Federal ERP.

Importantly, the parties do not disagree on several key facts relating to coverage. For example, there is no dispute that the Ross Claims fall within the coverage provided by the ERP, as they allege wrongful conduct occurring during the initial Policy Period. Also, Federal does not allege that Abercrombie failed to exercise the ERP option in accordance with Section 12 of the Policy, or to provide timely notice of the Ross Claims under Section 15.

Federal now seeks judgment as a matter of law and a declaration that the Federal Policy does not provide coverage to Abercrombie for the Ross Claims, based solely on Abercrombie's conduct in writing the National Union Policy to be excess to that of Federal, allegedly cutting off Federal's right of contribution in purported breach of Section 16(d) of the Federal Policy.

(Footnote omitted).

Applying Ohio law to the interpretation of the Federal Policy, the district court determined that the sections of the insurance contract in dispute could reasonably be interpreted "in such a manner that requires Federal to provide coverage for the Ross claims." The district court also found it could not dismiss the bad faith claim contained in Abercrombie's amended complaint. Accordingly, the district court denied Federal's motion for summary judgment.

Following its ruling on Federal's motion for summary judgment, the district court requested memoranda from the parties briefing any issues remaining in connection with Abercrombie's pending motion for partial summary judgment. In January 2009, the district court granted Abercrombie's motion, entering its declaration that Abercrombie was entitled

to advancement of four categories of costs from Federal.[6]  Federal filed its timely notice of appeal from the district court's January order and "all interlocutory orders leading thereto, including but not limited to the Order dated September 30, 2008, denying Federal's motion for summary judgment."

## II.

### A.    Jurisdiction

A preliminary issue raised by this appeal is our jurisdiction over it.  After Federal filed this appeal, Abercrombie moved to dismiss, asserting that the district court's January 2009 interlocutory order was not an appealable injunction under 28 U.S.C. § 1292(a)(1).[7]

A motions panel first considered this issue and in June 2009 denied the motion without prejudice, noting decisions from the Ninth and Eleventh Circuits allowing the

---

[6]The order states:

> Subject to the $1 million retention and the $10 million limit in Federal Policy No. 8159-62-13, Federal is hereby **ORDERED** to advance payment for the following categories of costs that Plaintiff has incurred and will incur in the future:  1) All reasonable costs incurred by Abercrombie or its current or former officers or directors to defend *Ross v. Abercrombie*, No. 2:05-cv-819 (S.D. Ohio); 2) All reasonable costs incurred by Abercrombie or its current or former officers or directors to defend *In re Abercrombie & Fitch Co. Derivative Litigation*, Lead Case No. 2:05-cv-819 (S.D. Ohio); and 3) All reasonable costs incurred by Abercrombie to investigate or evaluate whether it is in Abercrombie's best interest to prosecute the claims raised in the shareholder derivative suits, up to the Policy's $250,000 limit (*see* Federal Policy, pp. 1 and 12); 4) All reasonable costs incurred by Abercrombie in connection with the Order Directing Private Investigation and Designating Officers to Take Testimony, SEC File No. P-1305, after November 30, 2005, the date of the Order, to the extent such costs were incurred with respect to a Claim, as defined by the Federal Policy.

(Citation omitted.)

[7]The final judgment rule, codified at 28 U.S.C. § 1291, generally limits federal courts of appeals' jurisdiction to final decisions of the district courts; in the next section, certain interlocutory decisions of the district courts are excepted from the rule, giving us jurisdiction over orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions . . . ."  28 U.S.C. § 1292(a)(1).

immediate appeals of interlocutory orders directing insurers to advance litigation expenses.[8] Abercrombie maintains in its merits brief that the January 2009, non-final order of the district court is neither injunctive nor meets the requirements of *Carson v. American Brands, Inc.*, 450 U.S. 79 (1981) for other non-final orders: that a district court's appealable interlocutory order have a "serious, perhaps irreparable consequence," and can only be "effectually challenged" by immediate appeal. *Id.* at 84 (quoting *Baltimore Contractors v. Bodinger*, 348 U.S. 176, 181 (1955)).

In *Pacific Insurance Co. v. General Development Corp.*, 28 F.3d 1093, 1096 (11th Cir. 1994), the Eleventh Circuit considered whether an interlocutory partial summary judgment order directing insurance payments to insureds, pending resolution of the insurer's claim for rescission of the policy, was appealable under § 1292(a)(1). In its summary ruling that it had jurisdiction over the appeal, the court relied on *National Union Fire Insurance Co. v. Sahlen*, 999 F.2d 1532 (11th Cir. 1993).

*Sahlen* is a case in which the plaintiff insurer filed a complaint for rescission of an insurance contract based on the defendants' alleged misrepresentations in the application for insurance, which was ultimately resolved in the insurer's favor on its motion for summary judgment. Although it entered judgment, the district court reserved jurisdiction over the insurer's claim for reimbursement of payments for defense costs it had made prior to filing its suit for recission. On appeal, concerned that this reservation of jurisdiction over the reimbursement issue precluded appellate jurisdiction, the Eleventh Circuit submitted a *sua*

---

[8]*See Pac. Ins. Co. v. Gen. Dev. Corp.*, 28 F.3d 1093, 1096 (11th Cir. 1994); *Gon v. First State Ins. Co.*, 871 F.2d 863, 875 (9th Cir. 1989).

*sponte* question of jurisdiction to the litigants. Citing *Gon v. First State Ins. Co.*, 871 F.2d 863 (9th Cir. 1989), the panel determined that the district court's rulings in connection with the insureds' motion for partial summary judgment requesting payment of defense costs pending a decision on the complaint for rescission constituted grants of or modifications of an injunction, over which it had jurisdiction under § 1292(a)(1). *Gon* similarly held that a district court's order modifying its own earlier direction to an insurer to pay defense expenses in certain litigation as they were incurred was an appealable order under § 1292(a)(1). See *Gon*, 871 F.2d at 866.[9]

As argued by Federal, the relief sought by Abercrombie's amended complaint includes a judgment "*enjoining* Federal from failing and refusing to pay" certain defense costs. (Emphasis added.) Additionally, the order appears to fit the requirements set forth in *Gon*—citing 16 C. Wright, A. Miller, E. Cooper, & E. Gressman, *Federal Practice & Procedure: Jurisdiction* § 3922 at 29 (1977)—that it is enforceable by contempt, and is "designed to accord or protect some or all of the substantive relief sought by a complaint in more than temporary fashion." *Gon*, 871 F.2d at 865. In line with *Gon* and *Sahlen*, we determine that the district court's grant of partial summary judgment was an injunctive order, over which we have jurisdiction under 28 U.S.C. § 1292(a)(1).

**B.     Breach of Contract**

---

[9]Additionally, in *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 984 F.2d 223, 224-25 (7th Cir. 1993), the court held that it had jurisdiction over a non-final order requiring specific performance of a contract provision, *but see Saber v. FinanceAmerica Credit Corp.*, 843 F.2d 697, 702 (3d Cir. 1988) (holding an order to pay money under a settlement was a "legal remedy" and not an injunction within scope of § 1292(a)(1)).

We next turn to the merits of the appeal. Under Fed. R. Civ. P. 56(c), summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Our review of both the district court's interpretation of the insurance contract and its summary judgment determinations is *de novo*.[10] *See Duane Mgmt. Co. v. Prudential Ins. Co.*, 29 F.3d 245, 248 (6th Cir. 1994). There is no dispute here that Ohio law governs the interpretation of the Federal Policy. As quoted by the district court, under Ohio law, "[i]n order to defeat coverage, the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question." *Andersen v. Highland House Co.*, 757 N.E.2d 329, 332 (Ohio 2001) (internal quotation marks and citation omitted).

Federal relies on Federal Policy provision 16(d) for its claim that the district court erred in finding that Abercrombie did not commit a breach of the Federal Policy. Federal repeatedly invokes the language in § 16(d) that "in the event of a Claim the Insureds will do nothing that could prejudice [Federal's] position or its potential or actual rights of recovery," asserting that Abercrombie's actions in electing the extension of coverage from Federal, while also negotiating with National Union that Federal's liability for coverage would be

---

[10]Although Federal filed its appeal following the district court's decision on Abercrombie's motion for partial summary judgment, its arguments address the September 2008 decision of the district court on Federal's motion for summary judgment. Federal notes that the September order was neither final nor timely appealed, but concedes that "an appellate court, in its discretion, [may] exercise jurisdiction over issues that are not independently appealable when those issues are 'inextricably intertwined' with matters over which the appellate court properly and independently has jurisdiction," quoting *Hadix v. Johnson*, 228 F.3d 662, 669 (6th Cir. 2000). Because we have determined we have jurisdiction over this appeal, and the January 2009 order incorporates rulings made in the September 2008 order, we find we may consider the issues presented as "inextricably intertwined."

primary, violated that provision. Federal asserts that it had a "well-settled right to contribution" from National Union at the time Abercrombie learned of the claims against it, as without amendment to the National Union policy, the two insurers would have been equally liable for coverage. *See Buckeye Union Ins. Co. v. State Auto. Mut. Ins. Co.*, 361 N.E.2d 1052, 1055 (Ohio 1977). Federal contends that Abercrombie "abrogated" its right to contribution, by retroactively "colluding" with National Union to make Federal responsible for primary coverage of defense costs. Federal states that "Section 16(d), in short, takes a snapshot of Federal's rights on the day a **Claim** is made; Abercrombie is from that point obligated not to do anything that could undermine those rights."

Abercrombie argues that Federal has selectively quoted from the policy, taking the clause it relies on out of context. Provision (d) is the fourth of five parts of Section 16, labeled "Defense and Settlement:"

Defense and Settlement

16.    (a) It shall be the duty of the Insureds and not the duty of the Company to defend Claims made against the Insureds.

(b) The Insureds agree not to settle or offer to settle any Claim, incur any Defense Costs or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the Company's prior written consent. The Company shall not be liable for any element of Loss incurred, for any obligation assumed, or for any admission made, by any Insured without the Company's prior written consent. Provided the Insureds comply with Subsections 16(c) and (d) below, the Company shall not unreasonably withhold any such consent.

(c) With respect to any Claim that appears reasonably likely to be covered in whole or in part under this coverage section, the Company shall have the right and shall be given the opportunity to effectively associate with the Insureds, and shall be consulted in advance by the Insureds, regarding the

investigation, defense and settlement of such Claim, including but not limited to selecting appropriate defense counsel and negotiating any settlement.

(d) The Insureds agree to provide the Company with all information, assistance and cooperation which the Company may reasonably require and agree that in the event of a Claim the Insureds will do nothing that could prejudice the Company's position or its potential or actual rights of recovery.

(e) Any advancement of Defense Costs shall be repaid to the Company by the Insureds, severally according to their respective interests, if and to the extent it is determined that such Defense Costs are not insured under this coverage section.

Federal Policy, § 16. Abercrombie insists that this section of the policy covers its and Federal's rights and obligations only in connection with the defense and settlement of claims made against Abercrombie, and not Abercrombie's negotiations or agreements regarding insurance contracts and carriers.[11]

In its opinion, the district court agreed with Abercrombie that § 16 of the Federal Policy related only to the defense and settlement of claims, and was not violated by Abercrombie's actions in amending the National Union policy. The district court similarly found no bar to Abercrombie's actions in § 18, determining that the section's "plain language" allowed the amendment. Pointing out that § 7 of the Federal Policy (entitled "Subrogation") governed Federal's rights of recovery "in the event of payment under this policy," the district court determined that "Section 16(d) can reasonably be interpreted to

---

[11]Abercrombie also highlights the "deeming clause" language of § 12 of the Federal Policy, which states that claims falling within the extended coverage are deemed made during the original period of the Federal Policy (i.e. during September 1, 2004 - September 1, 2005). Abercrombie asserts that because the National Union Policy was not in effect during the 2004-05 time period, National Union would have no obligation to cover a claim deemed made during that period, and Federal is sole primary insurer of the Ross claims.

require the cooperation of Abercrombie in connection with the defense of a Claim, and no more."[12]

Federal argues that the district court's decision, in agreeing with Abercrombie, did not give effect to the Federal Policy as a whole, but improperly interpreted § 18 in isolation, without the limitation it argues is imposed by § 16. Federal cites to Ohio law standing for the proposition that courts must apply the terms of a contract as written, and cannot "read into a contract" meaning not given to the document by the parties. *See Motorists Mut. Ins. Co. v. Tomanski*, 271 N.E. 2d 924, 927 (Ohio 1971). Federal contends that the amendment of an existing policy (the National Union policy), that was not originally "specifically excess to the Federal Policy," while not violative of § 18 did breach § 16's proscription of actions which could "prejudice" Federal's "potential or actual rights of recovery."[13] We disagree.

Under Ohio law, we must "give the words in the policy their plain and ordinary meaning." *Minor v. Allstate Ins. Co., Inc.*, 675 N.E.2d 550, 553 (Ohio Ct. App. 1996). We read the policy as a whole, giving effect to all of its provisions, and not interpreting any

---

[12]The district court cited *Storer v. Ocean Accident & Guarantee Corp.*, 80 F.2d 470, 472 (6th Cir. 1935), an action brought under Ohio law on an insurance contract, for the purposes of a cooperation clause: "(1) To require the insured to aid in preparing the case for trial and in making proper defense; and (2) to prevent collusion between the insured and a friendly claimant." *See also* Lee R. Russ and Thomas F. Segalla, 14 Couch on Insurance § 199:4 (3d ed.) ("The main purpose of a cooperation clause is to prevent collusion while making it possible for the insurer to make a proper investigation.").

[13]Federal cites *Champion Spark Plug Co. v. Fidelity & Casualty Co.*, 687 N.E.2d 785, 793 (Ohio Ct. App. 1996) for the holding that an insured who breaches a consent-to-settle provision is automatically barred from coverage, making the unconvincing analogy that Abercrombie's alleged breach of § 16(d) bars it from coverage for the Ross claims and related investigation. However, as shown by Abercrombie, the case of *Ferrando v. Auto-Owners Mut. Ins. Co.*, 781 N.E.2d 927 (Ohio 2002) added the required element of prejudice to an insurer's defense based on the cooperation clause. Abercrombie argues, and the district court found, Abercrombie's actions did not prejudice Federal's "ability to defend the Ross Claims on the merits." Given our determination that Abercrombie did not breach the Federal Policy, we need not further address this issue.

section in isolation. *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 678 N.E. 2d 519, 526 (Ohio 1997). Section 16 of the Federal Policy sets forth (a) whose duty it is to defend Claims; (b) that Abercrombie cannot offer to settle any Claim without Federal's consent; (c) Federal's involvement in investigating and settling Claims; (d) that Abercrombie will fully *assist with such investigation*, including doing "nothing that could prejudice [Federal's] position or its potential or actual rights of recovery;" and (e) that Abercrombie will repay defense costs advanced by Federal if it is determined there was no coverage. It is clear that the purpose of §16 is to enumerate the parties' respective rights and obligations when a claim is made against an insured, and the insured is covered by the policy. It does not address the parties' rights and obligations when a policy has elapsed, a claim has been brought against a (formerly) insured, and the insured is deciding whether to elect—and how best to structure—extended insurance coverage.

As Abercrombie highlights in its briefing, Federal's position that §16(d) proscribes its actions in amending the insurance policy with National Union makes little sense when viewed in the context of Abercrombie's initial decision to elect the ERP coverage. At the time the Ross claims were filed, Federal had no coverage responsibility whatsoever, as its policy had just expired. The decision by Abercrombie to elect the ERP after claims had been made could certainly be said to "prejudice" Federal's "position," under the interpretation advanced by Federal, but Federal makes no such argument. The idea that the §16(d) language should apply to Abercrombie's negotiation with National Union, but not to

Abercrombie's election of the ERP, undermines Federal's argument that §16(d) applies to the situation at all.

There is no question that the interpretation advanced by Federal is not the only one that can "fairly be placed on the language in question." *Andersen,* 757 N.E.2d at 332. We find that the district court's interpretation of §16, limiting the provision's application to the defense and settlement of claims, to be entirely reasonable and supported by the language of the contract. There is nothing about §16 that prevents Abercrombie from making fiscally driven business decisions about its insurance coverage, even if such a decision is unanticipated by an existing or past insurer. Certainly §12 of the Federal Policy, giving Abercrombie a 30-day window in which to elect the extended coverage following the expiration of its 2004-2005 policy, contained no language limiting Abercrombie's ability to elect that coverage in the event that claims were made during the window period. We also note that the premium—double the premium for the first year—likely took this risk into account. As noted above, Federal nowhere contends that Abercrombie was not allowed to elect the ERP under those circumstances. Moreover, as argued by Abercrombie, a contract's specific provisions, such as § 12 of the Federal Policy, control over a more general provision such as § 16. *See Monsler v. Cincinnati Cas. Co.*, 598 N.E.2d 1203, 1209 (Ohio Ct. App. 1991).

We note further that while Federal dates Endorsement 17 as occurring in November 2005, entirely *after* Abercrombie's purchase of the extended Federal coverage, it is clear that negotiation of the amendment occurred as a part of the decision to elect the ERP. Such a

business negotiation was not prohibited by the Federal Policy.[14]  As the district court stated, in rejecting Federal's arguments about § 16, "[i]t is an unreasonable interpretation of Section 16(d) to find that it requires Abercrombie to structure its insurance needs based not on its own needs and in its own best interests, but rather to minimize its insurer's potential exposure."  In any event, even if we were to determine that § 16(d) was susceptible to more than one interpretation, strict construction of the language against the insurer is mandated by Ohio law.  *See Lane v. Grange Mut. Cos.*, 543 N.E.2d 488, 490 (Ohio 1989).

Because the Federal Policy does not impose limitations on allowable terms of insurance agreed to between Abercrombie and additional insurers, we find no error in the district court's interpretation of the Federal Policy.

The district court is **AFFIRMED**.

---

[14]We are also not persuaded by Federal's argument, citing *Moskowitz v. Progressive Ins. Co.*, 811 N.E.2d 174, 183 (Ohio Com. Pl. 2004), that these business decisions constituted a breach of the duty of good faith and fair dealing.  Moreover, Federal has waived this argument, as it did not bring it before the district court.  *See St. Marys Foundry, Inc. v. Employers Ins. of Wausau*, 332 F.3d 989, 995 (6th Cir. 2003).

KETHLEDGE, Circuit Judge, dissenting.

In construing a contract, the words matter. The words of § 16(d) make clear that it is not merely a "cooperation clause." To read the provision that way—which is how Abercrombie reads it—is to render nearly half the words of § 16(d) meaningless. Such an interpretation is neither reasonable nor permissible under Ohio law.

Instead, in plain and simple terms, § 16(d) imposes on Abercrombie a separate duty not to prejudice Federal's position after a claim is filed. Abercrombie breached that duty here. I think we ought to enforce the contract to which Abercrombie freely agreed. I would therefore reverse the orders at issue in this appeal.

A.

The chronology in this case is important. In 2004, Federal issued Abercrombie an insurance policy with $10 million in coverage for claims asserted within the policy period. That period expired on September 1, 2005. Abercrombie chose not to renew the policy for the following year, but instead purchased a $10 million policy from a different insurer, AIG. That policy's coverage began on September 1, 2005. The very next day—by happenstance, apparently—the Ross claims were filed against Abercrombie in federal district court.

It is undisputed that the AIG policy, as originally written, afforded Abercrombie primary coverage for those claims. Predictably, then, Abercrombie reported the claims to AIG. But what happened next was less predictable. On September 29, 2005, Abercrombie elected, under § 12 of the Federal Policy, to purchase ERP coverage from Federal. That election was Abercrombie's right; and it extended the Federal Policy period to September 30,

2005, thereby encompassing the Ross claims. The election cost Abercrombie $820,000—twice the cost of the original Federal policy—and seemed merely to afford Abercrombie duplicative coverage for claims already covered under its new policy with AIG. So the election seemed a strange thing to do.

Behind the scenes, however, Abercrombie was negotiating with AIG to revise its AIG policy—which again by its terms was primary as to the Ross claims—to be excess as to any claim covered by the now-extended Federal policy. The record makes clear that Abercrombie went to considerable lengths to hide from Federal the fact of those negotiations. Finally, on November 22, 2005—nearly three months after the AIG policy took effect—Abercrombie and AIG executed Endorsements 17 and 18 to the AIG policy. Endorsement 17 retroactively made the AIG policy excess as to a single species of claim: namely, claims made "under this policy and also under Policy No. 8159-6213 issued by Federal Insurance Company." Those claims, of course, were the Ross claims; and the effect of that change was retroactively to foist on Federal the entire burden of coverage for the claims, up to the $10 million policy limit. Absent that change, Federal and AIG would have shared that burden equally. The endorsement thereby saved AIG up to $5 million. But Abercrombie benefitted from the deal as well: in Endorsements 17 and 18, AIG waived Abercrombie's $2 million retention for the Ross claims and promised not to increase Abercrombie's premiums for a renewal policy the following year. It appears those changes effectively repaid Abercrombie the cost of its $820,000 ERP election, likely several times

over. The cost of all this largesse, of course, fell to the party not in the room—namely, Federal.

B.

Federal says that Abercrombie's participation in this scheme—the pejorative is earned here—violated § 16(d) of Federal's policy. That section provides:

> The Insureds [*i.e.,* Abercrombie] agree to provide the Company [*i.e.*, Federal] with all information, assistance and cooperation which the Company may reasonably require and agree that in the event of a Claim the Insureds will do nothing that could prejudice the Company's position or its potential or actual rights of recovery.

As shown above, the AIG policy took effect on September 1, 2005; the Ross claims were filed on September 2; and Abercrombie made its ERP election on September 29. As of the latter date, then, Federal was obligated to pay only 50% of the costs of the Ross claims, with AIG, per the express terms of its policy, on the hook for other half. Moreover, Abercrombie does not dispute that, had AIG thereafter *not* borne its share of those costs, Federal could have asserted a contribution claim against AIG for any amounts that Federal paid above 50%. *See Buckeye Union Ins. Co. v. State Auto. Mut. Ins. Co.*, 361 N.E.2d 1052, 1055 (Ohio 1977). That was the status quo on September 29; and at that point it was Abercrombie's undisputed obligation to "do *nothing* that could prejudice [Federal's] position or its potential or actual rights of recovery." Federal Policy § 16(d) (emphasis added).

But Abercrombie then did something—in the form of Endorsement 17—that both obligated Federal to pay 100% of the costs of the Ross claims and extinguished Federal's potential right of recovery against AIG. The effect of that action was to prejudice Federal's

position to the extent of $5 million, which Abercrombie and AIG then spread amongst themselves. That seems to me a patent violation of the terms of § 16(d).

Abercrombie disagrees with that conclusion. In its view, § 16(d) is merely a "cooperation clause"; and, Abercrombie says, "there is considerable legal authority demonstrating that the purposes of cooperation clauses are to prevent collusion between the insured and the claimant"—as opposed, apparently, to collusion between the insured and another insurance company—"and to permit the insurer to participate in the defense and settlement of claims." Aber. Br. at 28.

The short answer to this argument is that we do not construe contractual provisions in gross. That one provision contains the word "cooperation" does not mean that we treat it as identical to every other contractual provision that contains that word. And it is pointless, therefore, to talk about "cooperation clauses" categorically, without discussing the specific language in each of them. Abercrombie does not mention, much less discuss, a single word of the "cooperation clauses" whose meaning it would graft onto § 16(d) here.

But Abercrombie makes a more serious omission as well. Abercrombie does not explain—anywhere in its brief—what meaning, exactly, it attaches to the language that Federal relies upon in this appeal. The law requires Abercrombie to do so. "In construing a contract," we "must give meaning to every paragraph, clause, phrase and word, omitting nothing as meaningless, or surplusage[.]" *Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994) (applying Ohio law). Again, § 16(d) provides:

> The Insureds [*i.e.,* Abercrombie] agree to provide the Company [*i.e.*, Federal] with all information, assistance and cooperation which the Company may reasonably require *and agree that in the event of a Claim the Insureds will do nothing that could prejudice the Company's position or its potential or actual rights of recovery.*

(Emphasis added.)

The reality is that Abercrombie does not give any meaning to the language italicized above. Rather, it says only that § 16(d) *as a whole* "can reasonably be interpreted to require the cooperation of Abercrombie in connection with the defense of a Claim, and no more[.]" Aber. Br. at 19 (internal quotation marks omitted). That interpretation is not reasonable, however, because it violates the rule laid down in *Owens-Corning*. Standing alone, the first part of § 16(d)—"[t]he Insureds agree to provide the Company with all information, assistance and cooperation which the Company may reasonably require"—*already* requires Abercrombie to cooperate "in connection with the defense of a Claim, and no more." Abercrombie reads § 16(d) as if it ended there, with a period after "reasonably require."

But the provision does not end there. It goes on to say "*and* [the Insureds] agree that in the event of a Claim the Insureds will do nothing that could prejudice the Company's position or its potential or actual rights of recovery." That language describes an obligation, in addition to cooperation, to which Abercrombie freely agreed. The law says that obligation must mean something. Our task is to determine what it is.

Upon examination, the two parts of § 16(d) differ in fundamental respects. The first is a cooperation provision; the second is, for lack of a better term, an anti-prejudice provision. To cooperate is "[t]o work or act together toward a common end or purpose." *The*

*American Heritage Dictionary* 414 (3d Ed.). To prejudice is "[t]o affect injuriously or detrimentally by a judgment or an act." *Id.* at 1428. Thus one fundamental difference, simply stated, is that the first part of § 16(d) imposes an obligation to help; the second, an obligation not to hurt. The first obligation, moreover, is one to *take* certain action; the second, an obligation to refrain from certain action. Neither the law, nor good grammar, nor enforcement of the obligations that these sophisticated parties have chosen to assume, allow us to conclude that § 16(d) imposes only the first obligation, "and no more."

So I submit that § 16(d) imposes on Abercrombie an obligation to "do nothing" to prejudice Federal's position, and that Abercrombie's post-claim actions—whose very purpose was to increase Federal's liability by $5 million and to extinguish its contribution claim for that amount—were in violation of that obligation. And I see nothing in the remainder of § 16(d) to displace that common-sense conclusion. Abercrombie cites the heading of § 16—"Defense and Settlement"—as proof that the prejudice at issue here was not of the sort contemplated by the section. But that argument should go nowhere in a case where Abercrombie expressly sought, and obtained, an injunction requiring Federal to pay Abercrombie's *defense costs*—so far, $8 million of them. Moreover, contrary to Abercrombie's suggestion, there is nothing in § 16 generally, or § 16(d) specifically, that creates a safe harbor for prejudicial actions taken "with another insurance carrier." There is not a word of text that so limits Abercrombie's no-prejudice obligation. To the contrary, the text that is there—that Abercrombie shall "do *nothing* that could prejudice Federal's position"—could hardly be broader. The same is true of Abercrombie's obligation to "do

nothing" that could prejudice Federal's "potential or actual rights of recovery." That obligation extends not just to recovery against certain parties, but to "potential or actual rights of recovery"—period.

"Plain meaning" is an overused term. I believe, however, that it fairly applies here. Section 16(d)'s no-prejudice obligation is stated in terms that are simple, broad, and common to the law. The parties before us are sophisticated, and they freely agreed to those terms. I submit that we should enforce them.

C.

Abercrombie also presents several arguments external to § 16(d). The first is that two other sections of the Federal Policy—§§ 12 and 18—demonstrate that § 16(d) could not bar the scheme at issue here. Section 12 of the Policy affords Abercrombie a 30-day window to elect ERP coverage. And there is no disputing that Abercrombie's ERP election—which came after filing of the Ross claims—changed Federal's position for the worse. Thus, Abercrombie says, § 16(d)'s injunction to "do nothing" cannot mean what it says, which means in turn (and here the argument fails even on its own terms) that Endorsement 17 was permissible. Section 18, for its part, does not grant rights to Abercrombie at all, but instead diminishes them, by limiting the instances in which Federal's coverage is primary. But § 18 does implicitly contemplate that Abercrombie might have additional coverage for a particular claim. So Abercrombie says that section too shows that Endorsement 17 was fair game.

Abercrombie's contention as to § 12 is scythed down by an elementary rule. The existence of this rule, and that it applies here, are points on which the majority and I agree.

"[A] contract's specific provisions, such as § 12 of the Federal Policy, control over a more general provision such as § 16." Maj. Op. at 14 (citing *Monsler v. Cincinnati Cas. Co.*, 598 N.E.2d 1203, 1209 (Ohio Ct. App. 1991)). The rule's effect is to harmonize provisions that at first seem to conflict, rather than having one of them cancel the other out.

When we harmonize the two provisions here, § 16(d) remains a bar to conduct like Endorsement 17. I completely agree with the majority that § 12 is more specific than § 16(d) as to whether Abercrombie was free to extend its coverage within the 30-day ERP window, and that § 12 therefore controls that issue. But that only means that Abercrombie's ERP election was legal, not that Endorsement 17 was. That § 12 prescribes a highly specific right to elect ERP coverage, to which § 16(d) must yield, does not mean that § 16(d)'s "do nothing" language itself means nothing at all. That, in truth, is what Abercrombie intimates here. But the law is otherwise: Subject only to the right to elect ERP coverage, Abercrombie's no-prejudice obligation remains enforceable, to the full extent of its plain, broad terms, except to the extent it conflicts with some other provision that more specifically governs conduct like Endorsement 17.

There is no such provision. Abercrombie cites § 18, but that section—apart from being one that grants rights to Federal, not Abercrombie—contemplates decisions by Abercrombie as to how to layer its coverage only *before* a claim is filed. Section 18 provides in relevant part:

> If any Loss under this coverage section is insured under any other valid insurance policy(ies), then this coverage section shall cover such Loss, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such Loss is in excess of the applicable retention (or deductible)

and limit of liability under such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent, or otherwise[.]

This section confirms rather than refutes Federal's interpretation of § 16(d). Section 18 says that, if another company's policy provides coverage for a claim that is also covered by Federal's policy, the Federal coverage is excess (rather than primary) unless the other policy is by its terms *exclusively* excess. This provision would be an exercise in stultification, however, if the insured could amend the other policy to be exclusively excess *after* a claim is filed. That, of course, is what Abercrombie did in executing Endorsement 17.

Section 18 thus implies only that Abercrombie can structure its other insurance *before* a claim is filed. It has nothing to imply about afterwards. To read § 18 as Abercrombie does—as affirmatively, if implicitly, authorizing conduct that makes § 18 itself unenforceable—is beyond ironic. It is to interpret § 18 as meaningless, as a provision without effect, except to the extent § 18 renders § 16(d) meaningless as well. The law does not permit that interpretation.

Only two arguments of significance remain. First, that Abercrombie paid a lot of money to obtain ERP coverage does not mean it was entitled to do what it did here. As an initial matter, this argument requires a certain suspension of disbelief, since Endorsement 17 effectively repaid Abercrombie its money several times over. But even if one disregards that reality: What Abercrombie bought, under § 12, was a right of adverse selection—the right to obtain coverage from Federal after a claim is filed against Abercrombie, rather than

before. That right is valuable, and was priced accordingly. What Abercrombie did not buy, however, was a right of post-claim collusion. Section 16(d) says that right was not for sale.

Second, the rule that ambiguities are resolved against the insurer does not apply here. That § 16(d)'s terms are broad, does not mean they are ambiguous. *See Nationwide Mut. Fire Ins. Co. v. Wittekind*, 730 N.E.2d 1054, 1058 (Ohio Ct. App. 1999) ("a term is not ambiguous simply because it includes a wide variety of objects or concepts in its definition"). And that a contract is complicated, does not mean it is unclear. *See Value City, Inc. v. Integrity Ins. Co*., 508 N.E.2d 184, 189 (Ohio Ct. App. 1986) ("[a] contract is not ambiguous merely because it is complex or difficult to read as a whole"). I think the terms of the parties' agreement, when examined closely, provide a clear answer to the question presented here.

It is with no small irony, moreover, that Abercrombie cites the rule that ambiguities should be resolved against the insurer. The policies behind that rule, presumably, include the relative bargaining power and sophistication of insurer and insured. It is hard to imagine a case in which those policies are less apposite than they are here. If there was a wolf in this story, it was not Federal.

*        *        *

Although I write alone, I think it fair to say that the majority's decision does not lend to this scheme the imprimatur of this court. What is legal is sometimes different from what is right. Today Abercrombie is the beneficiary of that distinction.

I respectfully dissent.